In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-13-00366-CV**

_____

**SAMSON EXPLORATION, LLC, Appellant**

**V.**

**T.S. REED PROPERTIES, INC., et al.**
**Appellees**

**On Appeal from the 60th District Court**
**Jefferson County, Texas**
**Trial Cause No. B-173,008**

**MEMORANDUM OPINION**

We issued our original memorandum opinion in this cause on August 27, 2015, and afterwards, the appellant and the appellees filed motions for rehearing. The court denies the motions for rehearing; however, the panel withdraws its opinion and judgment and issues this opinion and judgment in their stead.

1

In this oil and gas case, filed by several stakeholders with interests in two pooled gas units, we are asked to decide two principal issues. First, whether the stakeholders participating in one of the pooled units can recover damages from the operator of the unit when the operator amended the boundaries of the unit to exclude a well that was within the boundaries of the original unit, and where the stakeholders accepted royalties attributable to the amended unit without challenging the operator's authority to amend the original unit's boundaries. Second, whether the stakeholders in another unit, based on their claims for breach of contract, can recover damages from the operator due to the operator's failure to pay royalties on oil and gas produced from a well that the operator contends was included in that unit by mistake.

With respect to the stakeholders in the first unit, given their actions following the amendment to boundaries of the unit, we conclude they ratified the operator's amendment to the boundaries of the first unit. Based on their ratification of the amendment to the unit, we hold they are entitled to recover nothing on their claims. With respect to the stakeholders in the second unit at issue in the appeal, and given the operator's failure to file an amendment to the description defining the unit's boundaries to correct its alleged mistake, we hold the stakeholders in that

unit can recover damages from the operator for its alleged breach of their leases. However, with respect to these stakeholders, we also conclude the trial court's awards are excessive, as the awards include royalties on production that occurred before the date their unit first existed.

## Background

This case involves numerous plaintiffs,[1] three gas wells, and two pooled units, the first of which the operator amended to change the unit's name and its

---

[1] Not all of the plaintiffs before us in the appeal were parties to the suit when it was initially filed. The Plaintiff's Tenth Amended Petition, filed in July 2012, is the live pleading before the court when the trial court rendered its final judgment. There were twenty-five parties to the suit at that time: (1) Thomas Klorer; (2) Gary Cruse (as executor of the Estate of Vivian Burch); (3) Mary Hyde; (4) Sallye Jones Keith; (5) The Simpson-Omohundro Foundation; (6) T.S. Reed Properties, Inc.; (7) Thomas Edwin Doran; (8) Florence Owens Dodington; (9) Joseph A. Owens II; (10) Roger Steven Holley; (11) Patricia Belden; (12) Valerie Klorer; (13) Cornelia Clark Akin; (14) Walter R. Taber Jr.; (15) William F. Taber; (16) Cecil Taber Ward; (17-19) Roger Craddock and Iris Klorer Craddock (Individually and as Trustees of the Craddock Family Trust); (20) Marlborough School; (21-22) Patricia Gardner Deland (Individually and as Independent Executrix of the John T. Gardner Estate); (23) the Sara Wilson Carlson Exempt Trust; (24) the Mark C. Wilson Grantor Trust; and (25) the William Andrew Fletcher Grantor Trust. The suits for the various trusts were filed by Capital One, N.A., as their trustee. Several stakeholders in the units, including the State of Texas, were never made parties to the suit. However, the record does not show that any of the parties ever claimed that any absent stakeholders were necessary parties, and no one ever objected to proceeding without them. *See Kodiak Res., Inc. v. Smith*, 361 S.W.3d 246, 249 (Tex. App.—Beaumont 2012, no pet.) (noting, in the context of an oil royalty case, that since the adoption of Rule 39 of the Texas Rules of Civil Procedure, courts

3

boundaries. In the trial court, the following plaintiffs[2] sued Samson Exploration, LLC[3] based on their claims that they owned an interest in mineral leases that Samson pooled into the units at issue.

---

generally refuse to treat the non-joinder of necessary parties as a defect that deprives a court of jurisdiction over the parties to the suit) (citing *Cooper v. Tex. Gulf Indus., Inc.*, 513 S.W.2d 200, 203 (Tex. 1974)). Nonetheless, the Court's opinion is not binding on any of the stakeholders in the units that were not parties when the final judgment was rendered.

[2] We omit the names of any plaintiffs that sued if they were not parties at the time of the judgment because the list of names is voluminous and the claims of any plaintiffs that joined the suit that were not parties when the trial court rendered judgment are not relevant to the issues on appeal. Under the trial court's final judgment, the following stakeholders prevailed on one or more of their claims: (1) Patricia Belden; (2-4) Roger Craddock and Iris Klorer Craddock, Individually and as Trustees of the Craddock Family Trust; (5) Thomas Klorer; (6) Valerie Klorer; (7) Marlborough School; (8) Simpson-Omohundro Foundation; (9) Capital One N.A., Trustee of the Sara Wilson Carlson Exempt Trust; (10) Capital One N.A., Trustee of the Mark C. Wilson Grantor Trust; (11) Thomas Edwin Doran; (12) Gary Cruse, as Executor of the Estate of Vivian Burch; (13) Cornelia Clark Akin; (14) Patricia Gardner Deland, as Executrix of the John T. Gardner Estate; (15) Florence Owens Dodington; (16) Capital One, N.A., Trustee of the William Andrew Fletcher Trust; (17) Roger Steven Holley; (18) Sallye Jones Keith; (19) Joseph A. Owens II; (20) T.S. Reed Properties, Inc.; (21) Walter R. Taber, Jr.; (22) William F. Taber; and (23) Cecil Taber Ward. Mary Hyde, a party to the suit when the trial court rendered its final judgment, recovered nothing on her claims. However, Hyde is not a party to the appeal.

[3] The trial court rendered judgment against Samson Exploration, LLC. However, when they filed their original petition, the plaintiffs sued Samson Lone Star, Limited Partnership. We are unable to locate a written stipulation in the record indicating that Samson Exploration, LLC acquired all of Samson Lone

Samson created the first of the units that are at issue in this appeal in 2001, when it filed a declaration creating the "Black Stone Minerals A No. 1 Gas Unit."[4] In January 2002, Samson completed a second successful gas well within the existing boundaries of the Black Stone Unit on the Joyce DuJay lease. The well is perforated between 13,150 feet to 13,176 feet subsurface, so its gas is produced at a level that also falls within the boundaries of the Black Stone Unit's pool. In 2002, after Black Stone refused consent to Samson's attempt to pool its lease into the Black Stone Unit, Samson filed an amended declaration that changed the

Star's assets and liabilities, and the summary judgment motions do not address whether Samson Exploration, LLC is Samson Lone Star's successor. Nonetheless, the parties all treat Samson Exploration LLC as Samson Lone Star's successor, and none of the parties argue that Samson Exploration, LLC was not properly named or that it was not liable in the capacity it was sued. Therefore, for the purposes of this opinion, we assume that Samson Exploration, LLC is Samson Lone Star's successor, and we refer to the entity "Samson." Nonetheless, we expressly do not decide if Samson Exploration, LLC is Samson Lone Star's successor, as that issue has not been brought before the Court and it is not at issue in the appeal.

[4] Samson designated the Black Stone Unit by filing a declaration in Hardin County's property records in March 2001. In June 2001, Samson successfully completed a gas well on property that had been leased to it by Black Stone Minerals Company, L.P. The well on the Black Stone lease, which will be referred to as the Black-Stone-lease well, was completed at a zone that falls within the boundaries of the Black Stone Unit. However, under Black Stone's lease with Samson, Samson was required to have Black Stone's written consent to pool the lease into a pooled unit. Black Stone would not give Samson written consent after Samson completed a successful producing well on its lease.

boundaries of the Black Stone Unit's pool. In the amendment,[5] Samson renamed the "Black Stone Minerals A No 1 Gas Unit" as the "Joyce DuJay No. 1 Gas Unit."[6] Following the Black Stone Unit's amendment, Samson did not attribute the gas produced by the Black-Stone-lease well to the amended and renamed Joyce DuJay Unit.

In late 2002, Samson successfully completed a third gas well that was perforated from 12,197 to 12,343 feet, which is above the pool that is associated with the Joyce DuJay Unit. However, the third well is located on the Joyce DuJay lease, and the Joyce DuJay lease is one of the leases that is included in the Joyce

---

[5] The February 20, 2002, amendment renamed the unit and altered the boundaries of the pool. Before the boundaries were amended, the pool associated with the Unit had boundaries of 6,000 to 13,800 feet. After the amendment, the pool associated with the renamed unit had boundaries of 12,400 feet and below. The amendment also renamed the Black Stone Unit as the "Joyce DuJay No. 1 Gas Unit," and changed the number of surface acres in the original unit from 704 surface acres to 570.962 surface acres, although the 570.962 acres is inside the boundaries of the original unit. By altering the pool's depths, the amendment removed the zone produced by the Black-Stone-lease well (12,304 feet to 12,332 feet) from the production that it subsequently attributed to the renamed Joyce DuJay Unit. Samson filed another amendment to the Joyce DuJay Unit in June 2003, which added two leases to the Joyce DuJay Unit's pool. However, the June 2003 amendment did not further alter the boundaries associated with the amended unit's pool.

[6] In the opinion, we refer to the amended unit as the Joyce DuJay Unit.

6

DuJay Unit. Approximately ten months after completing the third well, Samson created the "Joyce DuJay A No. 1 Gas Unit,"[7] defining a pool consisting of 704 acres that lies in Hardin and Jefferson counties, "provided such production occurs below a depth of 12,000 feet subsurface." Based on the description in the document that Samson filed in creating the DuJay-A Unit, the DuJay-A Unit's pool includes most of the leases and a significant portion of the zones that Samson previously defined for the Joyce DuJay Unit's pool. The two units share the zone that is being produced by the well located on the Joyce DuJay lease, and the Joyce DuJay lease is pooled into both units.

In 2004, six of the stakeholders in the Joyce DuJay Unit sued Samson claiming that Samson had breached its duties under leases by refusing to allocate any of the gas produced by the Black-Stone-lease well for their accounts. Subsequently, additional plaintiffs, some of them stakeholders in the Joyce DuJay

---

[7] In the remainder of the opinion, we refer to this unit, created in July 2003, as the DuJay-A Unit. Although Samson created the unit after the date that it completed the well on the DuJay-A lease, the declaration creating the DuJay-A Unit states that it is "effective as of the date of first production of the [DuJay-A] well."

Unit and some of them stakeholders in the DuJay-A Unit, joined the suit.[8] The

DuJay-A Unit stakeholders claimed that Samson failed to comply with its contract

obligations under the terms of their lease. All of the DuJay-A claimants based their

claims on a lease between Samson and T.S. Reed Properties[9] and the declaration

Samson filed when it created the DuJay-A Unit.

---

[8] The following twelve Joyce DuJay claimants prevailed on one or more of their claims against Samson under trial court's final judgment: (1) Patricia Belden; (2-4) Roger and Iris Craddock, Individually and as Trustees of the Craddock Family Trust; (5) Thomas Klorer; (6) Valerie Klorer; (7) Marlborough School; (8) Simpson-Omohundro Foundation; (9) the Sara Wilson Trust (Capital One N.A., Trustee); (10) the Mark C. Wilson Grantor Trust (Capital One N.A., Trustee; (11) Thomas Edwin Doran; and (12) Gary Cruse, as Executor of the Estate of Vivian Burch. The following eleven DuJay-A claimants prevailed under the judgment: (1) Cornelia Clark Akin; (2) Patricia Gardner Deland, as Executrix of the John T. Gardner Estate; (3) Florence Owens Dodington; (4) the William Andrew Fletcher Trust (Capital One, N.A., Trustee); (5) Roger Steven Holley, (6) Sallye Jones Keith; (7) Joseph A. Owens II, (8) T.S. Reed Properties, (9) Walter R. Taber, Jr., (10) William F. Taber, and (11) Cecil Taber Ward. The DuJay-A claimants filed a cross-appeal, alleging that the trial court failed to properly calculate the damages that resulted from Samson's breach of their lease.

[9] All of the DuJay-A claimants trace their interests in the DuJay-A Unit to a lease between Samson and T.S. Reed Properties. The record shows that in November 2001, T.S. Reed's president leased T.S. Reed's mineral interests in 826.997 acres of land to Samson. In an August 2002 amendment, T.S. Reed gave Samson the right to pool 213.038 acres of its 826.996 acre tract into the DuJay-A Unit. In 2007, eight of the DuJay-A claimants, Cornelia Clark Akin; Florence Owens Dodington; the William Andrew Fletcher Trust (by Capitol One, N.A., as Trustee); Roger Steven Holley; Sallye Jones Keith (by Capitol One, N.A., as her attorney-in-fact); Joseph A. Owens II; Walter R. Taber, Jr.; and William F. Taber, executed agreements ratifying T.S. Reed's 2001 lease and the 2002 amendment.

8

In a series of interlocutory summary judgment rulings between 2008 and 2013, the trial court resolved the parties' claims and defenses.[10] In its final judgment, the trial court awarded the prevailing Joyce DuJay claimants damages on their breach of contract claims, basing the awards on the royalties the Joyce

We find no written ratifications in the record from Patricia Gardner Deland, as executor of the Estate of John T. Gardner, or from Cecil Taber Ward. In their briefs, the parties treat the Estate of John T. Gardner and Cecil Taber Ward as if their respective interests are based on T.S. Reed's lease, as amended. However, in their briefs, the parties do not identify the summary judgment evidence that shows that Patricia Deland or Cecil Ward ratified T.S. Reed's lease or the lease's amendment. Nonetheless, Samson does not argue that the trial court's awards to Gardner's estate and Cecil Ward should be reversed based on their failure to prove that they ratified Samson's lease or the amendment to the lease with T.S. Reed Properties. Tex. R. App. P. 33.1, 38.1(f). Therefore, we do not address the claims of Gardner's estate or Cecil Ward separately from those of the other DuJay-A claimants.

[10] The first two interlocutory summary judgment orders, rendered in 2008, concerned some of the claims of the Joyce DuJay claimants and some of the claims of the DuJay-A claimants. The trial court rendered a third interlocutory summary judgment ruling in August 2012; in that order, the trial court resolved several more of the claims made by the DuJay-A claimants. In its fourth and fifth interlocutory summary judgment rulings, rendered in April 2013, the trial court granted, in part, the plaintiffs' amended motion for final summary judgment, but it denied relief on some of the plaintiffs' other claims. In its fifth interlocutory ruling, rendered in April 2013, the trial court denied Samson's counterclaims. In July 2013, in a final judgment, the trial court resolved all remaining issues and incorporated its prior interlocutory summary judgment orders into a final order. In that judgment, which is the judgment that is before us on appeal, the trial court denied Samson's counterclaims, and it awarded damages to twelve of the Joyce DuJay claimants and to eleven of the DuJay-A claimants.

9

DuJay claimants would have earned had Samson attributed production from the Black-Stone-lease well to the Joyce DuJay Unit.[11] The trial court awarded the DuJay-A claimants damages based on their breach of contract claims. The damages awards to the DuJay-A claimants are based on the royalties they would have derived from the unit had Samson allocated production from the well located on the Joyce DuJay lease to both the Joyce DuJay and DuJay-A Units.

Samson and the DuJay-A claimants timely filed appeals; both complain about various aspects of the trial court's final judgment. Tex. R. App. P. 26.1 (Time to Perfect Appeal). Generally, Samson argues the trial court erred in granting judgment in the plaintiffs' favor, and it contends the trial court should have granted its motion for summary judgment as to all of their claims. Alternatively, Samson argues that the trial court should have denied the motions for summary judgment filed by the Joyce DuJay and DuJay-A claimants because fact issues existed that require a trial. With respect to their cross-appeal, the DuJay-

---

[11] The damage award does not include any damages based on the Black-Stone-lease well's production between October 2012 and the date of judgment, nor does the award include anything based on the well's future production. We assume that the trial court did not award damages for these periods because no evidence was introduced to prove the damages that resulted or would reasonably result to the Joyce DuJay claimants during those periods.

10

A claimants argue the trial court failed to properly calculate their respective awards under the provisions of the lease to which they all trace their interests.

## Standard of Review

We review a trial court's ruling on a motion for summary judgment using a de novo standard of review. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). With respect to the Joyce DuJay and DuJay-A claimants' motions for summary judgment, they were required to demonstrate to the trial court that no genuine issue of material fact existed, and to show that they were entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *see also Knott*, 128 S.W.3d at 216. On appeal, we review the summary-judgment record "in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). To view the evidence in that light, we credit evidence that is favorable to the party that lost the motion if reasonable jurors could, and we disregard evidence that contradicts the losing parties' evidence unless the evidence cannot reasonably be disregarded. *Id.* at 827. Evidence is conclusive only if the trial court, based on the evidence, could have reached only one conclusion from the

11

summary judgment evidence that was before it. *See City of Keller*, 168 S.W.3d at 816.

With respect to Samson's motion for summary judgment, it was required, as a defendant moving for summary judgment, to conclusively negate at least one essential element on each of the plaintiffs' causes of action, or through its own summary judgment evidence, it was required to conclusively establish each of the elements on an affirmative defense that would create a bar to the plaintiffs' recovery. *See Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). To prevail on its traditional motion, Samson was required to demonstrate that no genuine issues of material fact existed that prevented the trial court from rendering judgment in its favor. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

When both the plaintiffs and defendants in a case move for summary judgment, and the trial court grants one motion and denies the other, all of the summary judgment evidence before the trial court is reviewed in the appeal to determine the questions that are presented by the competing motions. *Mann Frankfort*, 289 S.W.3d at 848. When possible, in cases involving cross-motions for

summary judgment, the appeals court is required to render the judgment the trial court should have rendered in the case. *Id.*

Ratification/Joyce DuJay Claimants

According to Samson, the Joyce DuJay claimants ratified the amendment of the Black Stone Unit by accepting royalties that were paid to the stakeholders of the Joyce DuJay Unit based on the acreage within the amended unit's boundaries. Samson contends that the Joyce DuJay claimants' ratification of its amendment to the Black Stone Unit bars the Joyce DuJay claimants from a recovery on all of their claims. On appeal, Samson contends the trial court erred by failing to grant its motion for summary judgment because the summary judgment evidence conclusively establishes that the Joyce DuJay claimants ratified its decision to amend the Joyce DuJay Unit's boundaries.

In response to Samson's defense of ratification, the Joyce DuJay claimants assert that Samson waived its right to complain about the trial court's ruling in their favor on their breach of contract claims because it failed to timely assert its defense of ratification. The Joyce DuJay claimants note that Samson did not raise its ratification defense before the trial court ruled, in 2008, that they were entitled to prevail on their claims. In reply, Samson contends that it did not waive its

13

defense by virtue of any delays because it presented its defense and obtained a ruling on it before the date the trial court rendered judgment. Having secured a ruling on its claim before the trial court rendered judgment, Samson argues that it properly preserved its right to our review of the merits of the trial court's ruling denying it any relief on its defense of ratification.

First, we address the Joyce DuJay claimants' argument that Samson's failure to raise its ratification defense before the trial court ruled on its motion in 2008 resulted in a waiver of the defense. *See generally* Tex. R. App. P. 33 (Preservation of Appellate Complaints). In this case, the record shows that Samson filed pleadings claiming ratification and obtained a ruling on its defense before the date the trial court's judgment became final. *See* Tex. R. Civ. P. 301 ("Only one final judgment shall be rendered in any cause except where it is otherwise specially provided by law."). Additionally, because the trial court's 2008 ruling did not resolve all of the claims and defenses raised by all of the parties to the case, the 2008 order granting the Joyce DuJay claimant's motion for summary judgment was interlocutory. Consequently, the trial court was authorized to change the rulings it made before it lost jurisdiction over the case, including its 2008 ruling on the Joyce DuJay claimants' motion. In other words, the court had the power to find

14

the Joyce DuJay claimants ratified the amended boundaries of the unit, even though it actually ruled to the contrary, denying that they had ratified the amendment to the unit. *See Rush v. Barrios*, 56 S.W.3d 88, 98 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

Because the trial court's 2008 order was interlocutory, and because Samson secured a ruling on its affirmative defense of ratification, the record shows that Samson presented its complaint to the trial court in a timely motion and that the trial court ruled on its request. *See* Tex. R. App. P. 33.1 (providing that to preserve error for appellate review, the complaining party must show that it presented its complaint to the trial court in a timely request, objection, or motion and that the trial court ruled on the request). We hold that Samson did not waive its right to appellate review regarding its defense of ratification.

Next, we consider the law related to ratification and the evidence of the circumstances that relate to Samson's decision to amend the Black Stone Unit. A doctrine of agency law, ratification is a common law doctrine that binds a person to another's unauthorized act if the person who is arguably bound is aware of the other's act, and, after becoming aware of the act, chooses to retain the benefits of the unauthorized act. *See Willis v. Donnelly*, 199 S.W.3d 262, 273 (Tex. 2006).

15

According to Samson, the Joyce DuJay claimants were notified of the amendment to the Black Stone Unit's boundaries, and afterward, they accepted royalty payments that were calculated based on the boundaries established for the Joyce DuJay Unit, whose boundaries did not include the gas and condensate being produced by the Black-Stone-lease well. Additionally, according to Samson, the Joyce DuJay claimants never challenged its authority to amend the boundaries of the original unit.

In cases that concern the purchase and sale of minerals and mineral interests, the doctrine of ratification is used to hold a party to the terms of an amended contract when the party complaining about the amendment accepted the benefits of the new agreement, even though it could have resisted doing so. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 676 (Tex. 2000) ("We agree with the courts below that there may be circumstances under which a party who was induced to enter a contract by fraud may ratify that contract in such a manner that a claim for damages is foreclosed."); *Thomson Oil Royalty, LLC v. Graham*, 351 S.W.3d 162, 166 (Tex. App.—Tyler 2011, no pet.) ("A party that accepts changed terms of a contract is deemed to have made its own decision that those terms are just; if it had thought otherwise, it should have resisted.").

16

In this case, it is undisputed that the Joyce DuJay claimants accepted royalties attributable to another well that Samson successfully completed on the Joyce DuJay lease that were calculated based on the smaller number of surface acres that are contained in the amended unit. The Joyce DuJay claimants also do not dispute that they never sought to have the amendment rescinded or to have it declared void, even though the amendment redefined the boundaries of the unit's pool and changed the surface acres of their unit.

In *Hooks v. Samson Lone Star, Limited Partnership*, 457 S.W.3d 52, 65-66 (Tex. 2015), the Texas Supreme Court held that a group of similarly situated stakeholders in the Black Stone Unit, who through the amendment became stakeholders in the Joyce DuJay Unit, had ratified the same amendment that is at issue in this case. In *Hooks*, the similarly situated group of plaintiffs asserted that Samson owed them royalties based on the production from the Black-Stone-lease well. Like the Joyce DuJay claimants, the stakeholders in the Joyce DuJay Unit in *Hooks* were aware that Samson had amended the Black Stone Unit. After the unit's amendment, the stakeholders in *Hooks* regularly accepted royalties on gas and condensate production that occurred from the Joyce DuJay Unit's pool. *Id*. Based on similar conduct as the conduct that is at issue here, the Texas Supreme Court

17

held that the stakeholders in *Hooks* could not claim they were due additional royalties based on the production from the Black-Stone-lease well which was no longer within the amended unit's boundaries because by their acts, they had ratified the amendment to the Black Stone Unit. *Id*. at 66. Under these circumstances, the Supreme Court rendered judgment in Samson's favor based on the conclusive evidence before it of the stakeholders' acts.

After carefully reviewing the summary judgment evidence, we find no significant distinction between the acts of the stakeholders in the Joyce DuJay Unit that are at issue here and the acts the Supreme Court relied on in *Hooks* to conclude that by such acts, Samson's amendment was ratified and had been accepted. Because the summary judgment evidence conclusively establishes that the Joyce DuJay claimants ratified the amendment to their unit, Samson was no longer obligated to attribute any of the production from the Black-Stone-lease well to the Joyce DuJay Unit. We reverse the principal and interest awards the trial court awarded to the Joyce DuJay claimants on their claims that are based on the

production of the Black-Stone-lease well,[12] and we render judgment in Samson's favor with respect to these claims. Tex. R. App. P. 43.2(c).

## DuJay-A Claimants

### *Contentions of the Parties*

Next, we turn to the claims of the DuJay-A claimants, which concern whether they are entitled to share in the production from a well[13] that produces in a zone that is common to the Joyce DuJay and DuJay-A Units' pools. All of the DuJay-A claimants' interest are derived through the T.S. Reed lease, which Samson pooled into the DuJay-A Unit. Additionally, the T.S. Reed lease is not one of the leases that Samson pooled into the Joyce DuJay Unit, so the minerals that lie underneath this acreage are included in the DuJay-A Unit's pool. In the judgment, the DuJay-A claimants recovered on their breach of lease claim, which is based on

---

[12] These awards are listed in the final judgment under a column that is labelled "Unpooling Order."

[13] The well on the Joyce DuJay lease is perforated between 13,150 feet and 13,176 feet subsurface, which is within the zone shared by the pools based on the declarations that govern the boundaries of the Joyce DuJay and the DuJay-A Units. The zones the two pools do not share are comprised of a zone between 12,000 feet and 12,399 feet that lies above the Joyce DuJay-Unit's pool, and a zone that lies beneath the T.S. Reed acreage that was pooled into the DuJay-A Unit. These two zones lie exclusively within the DuJay-A Unit's pool.

Samson's decision to attribute all of the gas production coming from the well that produces gas from a zone common solely to the Joyce DuJay Unit.

In its appeal, Samson advances several arguments to support its claim that the trial court's judgment in favor of the DuJay-A claimants should be reversed. First, Samson argues that the trial court erred in failing to apply the statute of limitations as a bar to the DuJay-A claimants' breach of contract claims. Second, Samson contends that the trial court erred in rejecting its arguments that the doctrines of estoppel, ratification, and waiver applied to the DuJay-A stakeholders' claims. Third, Samson suggests that to require it to pay royalties on the production from the well on the Joyce DuJay lease to the unitholders of both the Joyce DuJay and DuJay-A Units is impracticable. Fourth, Samson asserts the trial court improperly construed the agreements when determining the boundaries of the DuJay-A Unit's pool. It argues that a proper construction of the documents relevant to the boundaries of the DuJay-A Unit's pool reveals that the two pools do not share a common zone. Fifth, Samson suggests that the trial court erred in failing to excuse what it characterizes as a mistaken description of the DuJay-A Unit's boundaries. Sixth, and as an alternative to its arguments that suggest the

pools do not overlap, Samson argues that it is entitled to a trial on its claim seeking reimbursement for overpaying royalties to the Joyce DuJay claimants.

The DuJay-A claimants contend the trial court did not err in granting a summary judgment in its favor on all of Samson's defenses, including Samson's claim for reimbursement. By cross-appeal, the DuJay-A claimants contend that the damages they were awarded are too small. According to the DuJay-A claimants, the trial court erred by discounting their awards based on their ownership of less than all of the minerals in the T.S. Reed tract.

*Limitations*

According to Samson, the four-year statute of limitations applies to the DuJay-A claimants' suit. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.004 (West 2002) (providing for a four-year limitations period for actions for debt). Based on a four-year limitations period, Samson argues that by July 2007, the DuJay-A claimants should have filed a pleading that gave Samson fair notice of their theory that Samson had breached the lease by failing to attribute any of the production from the well on the Joyce DuJay lease to the DuJay-A Unit. While Samson acknowledges that all of the DuJay-A claimants were parties to the suit before July 2007, it contends that the pleadings filed by the DuJay-A claimants before July

21

2007 did not fairly assert a claim for breach on a theory involving the minerals being produced by the well on the Joyce DuJay lease, which is the theory under which the DuJay-A claimants ultimately, in 2013, recovered.

The record shows that the DuJay-A claimants were parties to the case by November 16, 2006, the date they filed their Fifth Amended Original Petition. Under the Texas Rules of Civil Procedure, a pleading of a claim for relief is required to contain "a short statement of the cause of action sufficient to give fair notice of the claim involved[.]" Tex. R. Civ. P. 47. In this case, Samson challenges whether it had fair notice of the claim on which the DuJay-A claimants ultimately recovered. Samson contends the Fifth Amended petition did not give it fair notice of a breach of contract claim that was based on a claim regarding a well that was producing from a zone common to the pools of the Joyce DuJay and the DuJay-A Units.

In their Fifth Amended Petition, the DuJay-A claimants alleged that Samson designated a zone for a unit without designating a lower boundary, they identified that production occurred in a zone produced by a well completed on the Joyce DuJay lease, they alleged that the Hardin County tracts that Samson pooled into the DuJay-A Unit include the same tracts that were pooled into the Joyce DuJay

22

Unit, and they alleged that Samson had breached its lease because it failed to pay them the royalties they were owed. In our opinion, the Fifth Amended petition raises a claim for nonpayment of royalties that is consistent with the claim on which the trial court awarded damages.[14] We hold that the Fifth Amended Petition relates to the claims that the DuJay-A claimants raised in their live pleading, their Tenth Amended Petition.

The Tenth Amended Petition contains more specific pleadings regarding the DuJay-A claimants' theory that Samson had breached its lease by refusing to allocate any of the production occurring from the well on the Joyce DuJay lease to the DuJay-A Unit. Section 16.068 of the Texas Civil Practice and Remedies Code creates a relation back rule for claims, as it provides:

> If a filed pleading relates to a cause of action, cross action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.

---

[14] Samson's limitations arguments are based on whether the allegations in the Fifth Amended Petition gave it notice of the claim on which the DuJay-A claimants recovered.

Tex. Civ. Prac. & Rem. Code Ann. § 16.068 (West 2015). In our opinion, the claims in the Fifth Amended Petition are not wholly based on different transactions or occurrences than those that are described by the Tenth Amended Petition. *See Lexington Ins. Co. v. Daybreak Exp., Inc.,* 393 S.W.3d 242, 244-45 (Tex. 2013) (explaining that claims that are not wholly based upon different transactions or occurrences are not barred if the more recently filed pleading relates to the same occurrence and damages asserted in older pleadings filed before the proscriptive period runs). Because the claims alleged in the DuJay-A claimants' Fifth Amended Petition were broad enough to encompass the claim on which they ultimately recovered, Samson's limitations arguments are without merit.

*Estoppel, Ratification, and Waiver*

According to Samson, the summary judgment evidence was conclusive or raised fact issues on its defenses alleging theories of estoppel, ratification, and waiver. Samson contends that the evidence shows: (1) it advised the DuJay-A claimants that they had no interest in the well located on the Joyce DuJay lease, (2) the DuJay-A claimants expressly agreed to pool 213.038 acres of their land into a unit that it created "in order to form the Unit for the [DuJay-A] Unit Well," (3)

24

Samson told the DuJay-A claimants, by payment letters,[15] which it sent in lieu of a division order, that it had completed a well on the DuJay-A Unit as a producing gas well, and that thereafter, (4) all of the DuJay-A claimants "accepted royalty payments from Samson solely for production from the [] well" located on the DuJay-A lease.

Samson discusses its defenses of waiver, ratification, and estoppel as a single group as if the three theories are all based on the same elements; its brief does not address the elements of the defenses, which are not identical, separately. Consequently, we interpret Samson's argument regarding these defenses as asserting a defense of quasi-estoppel, a doctrine that "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). "The doctrine applies when it would be unconscionable to allow a party to maintain a position inconsistent with one to which the party acquiesced, or from

---

[15] In our review of the summary judgment evidence, we find only eight of the DuJay-A claimants signed division orders that reference the well on the DuJay-A lease. The orders do not reference the well on the Joyce DuJay lease. The division orders relied on by Samson and found in the record were signed by Cornelia Clark Akin, Walter R. Taber Jr., William F. Taber, Florence Owens Dodington, Joseph A. Owens II, Roger Steven Holley, the William Andrew Fletcher Trust (by Capital One, N.A., its trustee), and Sallye Jones Keith (by Capital One, N.A., as her agent).

25

which the party accepted a benefit." *Cimarron Country Prop. Owners Ass'n v. Keen*, 117 S.W.3d 509, 511 (Tex. App.—Beaumont 2003, no pet.).

Samson relies heavily on the Texas Supreme Court's decision in *Hooks v. Samson Lone Star Limited Partnership* and the First Court of Appeals' decision in that same case, which the Supreme Court reversed, to support its quasi-estoppel arguments. *See Samson Lone Star, Ltd. P'ship v. Hooks*, 389 S.W.3d 409 (Tex. App.—Houston [1st Dist.] 2012), *rev'd in part, Hooks v. Samson Lone Star, Ltd. P'ship,* 457 S.W.3d 52 (Tex. 2015). However, there are significant differences between the facts in *Hooks*, which concerned the Black Stone Unit and Samson's amendment of that unit and the facts regarding the actions of the parties as related to the DuJay-A Unit. *See Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d at 65-66.

Unlike the facts that surround Samson's amendment to the original Black Stone Unit, Samson never filed an amendment in the property records of Hardin or Jefferson County to change the boundaries of the pool that created the DuJay-A Unit. Thus, unlike *Hooks*, Samson never clearly placed the DuJay-A claimants on notice that it was offering them another bargain. *See id*. Instead, Samson acts as if its decision to create overlapping units should simply be overlooked, even though

26

it never filed a document to amend the boundaries of the DuJay-A Unit to correct its alleged mistake. Instead, by allocating all of the production from the well that produces from a common zone to only the Joyce DuJay Unit, Samson simply ignores its own filing as if the pool it described created boundaries different than those reflected by its filings.

Samson also argues that by cashing their royalty checks, the DuJay-A claimants acted in a manner that is inconsistent with the terms of the division orders that are in the record that is before us. The division orders relevant to the DuJay-A Unit share the following language, which states: "THIS DIVISION ORDER DOES NOT AMEND ANY LEASE OR OPERATING AGREEMENT BETWEEN THE INTEREST OWNER AND THE PAYOR, THE LESSEE, OR THE OPERATOR, OR ANY OTHER CONTRACTS FOR THE PURCHASE OF OIL, GAS, OR OTHER HYDROCARBONS." Given this language, we are not persuaded an act of cashing a royalty check is conduct that is inconsistent with a claim that the check was not calculated in accordance with the terms of the parties' written agreement, their lease. Additionally, the royalty checks in the summary judgment record do not contain any language indicating the checks were tendered in full and final settlement of the royalties that were then due. *Cf. Yelderman v.*

*McCarthy*, 474 S.W.2d 781, 783-84 (Tex. Civ. App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.) (holding that in an action to recover royalties, where the checks contained language indicating the check was being tendered as payment in full, that the lessor's notation on the checks, stating the check was being accepted as partial payment only, could not vary the language the issuer had placed on the check).

Finally, in this case, Samson never amended the declaration that it filed with respect to the boundaries of the DuJay-A Unit's pool. Instead, even after the suit was filed, and Samson was placed on notice of the claims that it was not properly allocating production in the common zone to both units, Samson did not suspend the disputed royalties pending the outcome of the case. Instead, it proceeded as if the DuJay-A Unit's pool did not overlap with the Joyce DuJay Unit's pool.

We conclude that Samson calculated that it would derive a greater benefit from refusing to amend the boundaries of the DuJay-A Unit's pool to correct its alleged mistake. Given that circumstance, it is not unconscionable that Samson be required to answer in damages based strictly on the DuJay-A claimant's theory that Samson had breached the T.S. Reed lease. We hold that there is no dispute on any material fact regarding the elements of a claim of quasi-estoppel, and that under

28

the circumstances of this case, equitable relief is not proper, expedient, or necessary. *See State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979) (explaining that the jury decides if there are questions of fact in dispute but that it does not determine the expediency, necessity, or propriety of equitable relief); *Cimarron*, 117 S.W.3d at 512. We hold the trial court did not err granting the DuJay-A claimants' motion for summary judgment on Samson's claims based on waiver, ratification, and estoppel.

*Impracticability*

Samson argues that performing under the terms of its written agreement was impossible[16] because the law does not authorize it to create pools that share a

---

[16] In its brief, Samson does not characterize its impossibility argument as an affirmative defense; instead, it argues that the judgment should be reversed because the trial court committed error by construing its designation and the T.S. Reed lease in a manner that resulted in the creation of a pool that shares a zone in common with a pool previously created for another unit. While Samson presented this argument to the trial court as part of its response to the DuJay-A claimants' motion for summary judgment, Samson's argument essentially asserts a defense that claims enforcing the contract is impracticable. However, Samson did not plead impracticability as a defense in its live pleading. *See* Tex. R. Civ. P. 94 (requiring that a party plead various affirmative defenses, including "any other matter constituting an avoidance or affirmative defense"); *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 212 (Tex. 1996) (noting that affirmative defenses seek to establish independent reasons why the plaintiff should not recover). Nevertheless, the DuJay-A claimants never objected in the trial court that Samson's defense claiming impracticability was never pled. Under the circumstances in this case, we

common zone. However, it cites no statute that prohibits it from creating such a pool, and it cites no cases holding that a lessee with broad pooling authority cannot exercise its authority in such a manner.

In response to Samson's claim of impracticability,[17] the DuJay-A claimants argue that the pooling authority provision of their lease does not prohibit Samson

conclude that the defense of impracticability was an issue the parties tried by consent, and that Samson did not waive its right to assert the defense by failing to plead it in its answer. *See DeBord v. Muller*, 446 S.W.2d 299 (Tex. 1969) (holding that a defendant's affirmative defense raised in a motion but not in the answer was not fatal to its argument that the summary judgment before the court required the trial court's judgment be reversed); *see also Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991) (noting that claims or defenses that are not pled but tried by express or implied consent are treated as if they were raised by the pleadings).

[17] With respect to its claim of impracticability, Samson asserts *Hooks* applies as the law of the case with respect to the DuJay-A claims. "The 'law of the case' doctrine is defined as that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986). The law of the case doctrine is discretionary with the court, and does not apply at a "later stage of litigation that presents different parties, different issues, or more fully developed facts." *Smith v. Allstate Indem. Co.*, No. 09-01-348-CV, 2002 WL 31627974, at *1 (Tex. App.—Beaumont Nov. 21, 2002, pet. denied) (not designated for publication); *see also Harris Cnty. Flood Control Dist. v. Kerr*, 445 S.W.3d 242, 252-53 (Tex. App.—Houston [1st Dist.] 2013), *aff'd*, No. 13-0303, 2015 WL 3641517, *6 (Tex. June 12, 2015) (explaining that the law of the case doctrine did not apply, where a subsequent appeal of the same case involved different parties and different facts); *Pitman v. Lightfoot*, 937 S.W.2d 496, 513 (Tex. App.—San Antonio 1996, writ denied) (noting that the appellate court's prior opinion that

from forming a pool for the DuJay-A Unit that shares a common zone with another unit's pool. Relying on *Southland Royalty Company v. Humble Oil & Refining Company*, 249 S.W.2d 914, 916-17 (Tex. 1952), and *Sohio Petroleum Company v. Jurek*, 248 S.W.2d 294, 298 (Tex. Civ. App.—Fort Worth 1952, writ ref'd n.r.e.), the DuJay-A claimants point to the declarations that Samson filed for the Joyce DuJay and DuJay-A Units that created pools with a large area that overlaps. According to the DuJay-A claimants, Samson could create units with common zones because the law "does not require a cross-conveyance between the lessors."

---

limitations barred suit against certain shareholders was not law of the case in a subsequent appeal regarding other shareholders). In *Hooks*, the Supreme Court did not address the facts that concern Samson's formation of the DuJay-A Unit. *Hooks*, 457 S.W.3d at 66. In *Hooks*, the Supreme Court determined that those plaintiffs ratified Samson's amendment to the Black Stone Unit but the claims at issue in this part of the case concern another unit whose boundaries have never been amended. *See id*. Moreover, in *Hooks*, the Supreme Court did not decide if pooled units could overlap. *Id.* However, Samson contends that the Court of Appeals in *Hooks* implicitly determined that units cannot overlap, and argues that the DuJay-A claimants theory that pools may contain a common zone ignores the law of the case as decided in the intermediate appellate court. *See Hooks*, 389 S.W.3d at 431-34. The parties in this case were not parties to the judgment that was appealed in *Hooks*. *See Hooks*, 389 S.W.3d at 409. Thus, Samson's argument for applying the law of the case doctrine to claims that concern the formation of a unit not at issue in *Hooks* are not persuasive, as that case involved different parties and with respect to the formation of the DuJay-A Unit, facts that were not present in *Hooks*. *Id*.

31

Significantly, the case at bar was not tried as a trespass to try title case; instead, the trial court awarded contract damages under the DuJay-A claimants' breach of contract theory. Additionally, the trial court denied all claims for declaratory and injunctive relief.[18] Therefore, we need not resolve whether the pooling of the lessors' mineral interests results in a cross-conveyance of the lessors' property rights because title to the property is not what is at issue here.

Nonetheless, we are required to address whether the T.S. Reed lease restricted Samson's authority to create the pool that Samson described in the declaration that it filed to create the DuJay-A Unit. Whether Samson was authorized to create the pool at issue concerns a matter of contract law. *See Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 424 (Tex. 2008) (noting that "oil and gas leases in general, and pooling clauses in particular, are a matter of contract"). Therefore, we look to the language of the parties' lease and the lease amendment to determine the scope of Samson's authority regarding its pooling of the T.S. Reed lease.

---

[18] Although the DuJay-A claimants filed a cross-appeal, the arguments they make in their cross-appeal do not contend the trial court erred by denying their claims for declaratory or injunctive relief.

Under the lease between Samson and T.S. Reed, Samson could not pool T.S. Reed's tract unless all of the acreage of the tract was pooled. In August 2002, Samson and T.S. Reed agreed to amend the pooling provision, and T.S. Reed's president gave "Samson the right to pool 213.038 acres of land . . . to form the Unit for the [DuJay-A] Unit Well." However, the amendment does not describe the boundaries of the proposed unit. When the lease was amended in 2002, Samson had not yet designated the boundaries of the DuJay-A Unit's pool, although it is clear that the pool was to include the well on the DuJay-A lease. However, there is no indication in the amendment that the well on the DuJay-A lease was the only well that Samson intended to include in the pool. Significantly, the only restrictions on Samson's pooling authority regarding the 213-acre tract are that Samson was required to pool the entire 213-acre tract and the tract was to be pooled into the DuJay-A Unit.[19]

In this case, none of the parties has claimed that Samson exercised its pooling authority in bad faith, and Samson never amended the boundaries of the

---

[19] While the stakeholders in another unit might have a cause of action against Samson if Samson were shown to have exercised its pooling authority in bad faith, the Joyce DuJay stakeholders who were parties to the suit did not file a claim against Samson asserting that it had exercised its pooling authority in bad faith.

33

DuJay-A Unit's pool. Because there is no claim the tract was pooled in bad faith, and in light of the broad pooling authority T.S. Reed gave Samson in the amendment to pool the tract, we conclude that the parties' agreement did not restrict Samson from pooling the lease into a pool that overlapped the pool of another preexisting unit. *See Se. Pipe Line Co., Inc. v. Tichacek*, 997 S.W.2d 166, 170 (Tex. 1999) ("A lessee's pooling decision will be upheld unless the lessee pools in bad faith.").

Next, we consider Samson's argument that enforcing its obligations under its lease, which requires it to account for production that occurred in a shared zone, is impossible. Under Texas law, a defendant may defend a claim for breach of contract by showing that the obligation it undertook to perform was rendered impracticable. *See Centex Corp. v. Dalton*, 840 S.W.2d 952, 954 (Tex. 1992) (relying on the defense of supervening impracticability, as stated in the Restatement (Second) of Contracts § 261 (1981), the court held that the buyer's contract with a consultant was unenforceable because a governmental regulation, prohibiting the buyer's performance, invalidated the contract). However, the doctrine requires that the breaching party be without fault. *Id*. In this case, the summary judgment evidence shows that Samson and its agents were the only

decision makers with respect to creating the boundaries of the pools at issue. The

Restatement provision cited by the Texas Supreme Court in *Centex* provides:

> **§ 261. Discharge by Supervening Impracticability**
>
> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 261 (1981); *see Centex*, 840 S.W.2d at 954.

The sections that follow, Sections 262-266, address the various contexts in which

the defense applies to excuse a defendant's breach of its duty to perform the

obligations required by its contract. Restatement (Second) of Contracts §§ 262

(Death or Incapacity of Person Necessary for Performance), 263 (Destruction,

Deterioration or Failure to Come into Existence of Thing Necessary for

Performance), 264 (Prevention by Governmental Regulation or Order), 265

(Discharge by Supervening Frustration), 266 (Existing Impracticability or

Frustration) (1981).

Under the circumstances presented in this case, none of the summary

judgment evidence shows that any of the DuJay-A claimants were involved in the

decisions Samson made to establish the boundaries of the pools at issue, nor was

35

there any evidence that the DuJay-A claimants were on notice of the unit's boundaries before Samson filed the document that declared them. Additionally, not any of the Restatement exceptions apply, as the condition frustrating Samson's performance is wholly based on its own fault in creating overlapping pools. *Id*. Under the circumstances shown by the summary judgment evidence, the trial court did not err when it granted the DuJay-A claimants' motion for summary judgment on Samson's defense of impossibility.

*Construing T.S. Reed Lease to Avoid Overlapping Pools*

Samson argues the T.S. Reed lease should be construed so the boundaries of the DuJay-A Unit's pool are established as existing at 12,000 feet to 12,399 feet subsurface. In response, the DuJay-A claimants contend that the provisions in the T.S. Reed lease are not relevant to the boundaries that Samson established for the DuJay-A Unit's pool.

Prior to the amendment previously discussed, T.S. Reed's lease required that each production unit "shall be limited to a depth of one hundred feet (100') below the total depth to which the first productive well is drilled on the unit, which depth shall be determined by a Schlumberger, Halliburton, or other electrical log, which Lessee shall cause to be run." Samson notes that the well on the DuJay-A lease

36

was drilled to a depth of 12,500 feet, and it relies on the above provisions to conclude that T.S. Reed's lease "created an automatic depth limitation on the [DuJay-A Unit] of 12,600 [feet]."

Samson's argument is presented in an effort to rewrite the unambiguous boundaries of the pool that it declared when it created the DuJay-A Unit. Additionally, if the question is one of authority, the DuJay-A claimants ratified Samson's act to create the overlapping pools when they sued it to enforce the boundaries Samson created, even if Samson did create a pool that their lease did not authorize it to create. *See Montgomery v. Rittersbacher*, 424 S.W.2d 210, 215 (Tex. 1968).

Nevertheless, even if the terms of the original T.S. Reed lease are relevant to determining the boundaries of the DuJay-A Unit's pool, Samson's argument does not prevent the pools from overlapping so that they share the zone of production that is at issue here. The first productive well in the DuJay-A Unit is the well located on the Joyce DuJay lease, as it was completed before the well was completed on the DuJay-A lease. Thus, the bottom for the DuJay-A Unit's pool would still overlap the zone that includes the level being produced by the well on the Joyce DuJay lease. While Samson raises other arguments regarding other

37

provisions in the original T.S. Reed lease in an effort to rewrite the boundaries for the pool that it declared for the DuJay-A Unit, Samson never explains how any of the restrictions upon which it relies survived the lease's 2002 amendment that specifically authorized Samson to pool the 213 acre tract at issue into the DuJay-A Unit.

Given the unambiguous language in the unit declaration that established the boundaries of the DuJay-A Unit's pool, the trial court properly rejected Samson's arguments that the language in other documents was relevant to establishing the pool's boundaries. *See Sheppard*, 282 S.W.3d at 422 ("A lease is not necessarily required for pooling; mineral owners can join a pool even if no lease exists."). We overrule Samson's arguments that suggest the trial court did not properly construe the documents relevant to defining the DuJay-A Unit's pool.

*Scrivener's Error*

Samson also argues that the trial court erred by failing to reform the boundaries of the DuJay-A Unit's pool because it mistakenly created a pool for the unit that shared a zone with another pool. Samson suggests the mistake that was made to define the boundaries of the pool was that of its attorney, and it suggests

38

that the document it filed should have indicated that the pool was bottomed at approximately 12,400 feet.

In response, the DuJay-A claimants argue that pool's boundaries cannot be reformed because Samson failed to request they be reformed within four years of the date that Samson declared the pool to exist.[20] The DuJay-A claimants assert Samson's request to reform the size of the DuJay-A Unit's pool is barred by the four-year statute of limitations. Additionally, the DuJay-A claimants contend that the summary judgment evidence shows that Samson acted without their involvement in designating the boundaries of the DuJay-A Unit's pool, and they conclude that Samson's alleged mistake in defining the pool's size was not mutual. They further contend that Samson was required but failed to show that (1) the contract would be unconscionable, (2) the mistake concerned a material feature of

---

[20] In its Seventh Amended Answer and Counterclaim, filed February 2013, one of Samson's counterclaims alleges its failure to include a lower depth for the DuJay-A Unit's pool designation was the result of a scrivener's error. In response to Samson's counterclaim asserting its claim of scrivener's error, the DuJay-A claimants filed a motion for partial summary judgment, based on both traditional and no-evidence grounds. In their motion, they asked the trial court to deny Samson's claim because Samson failed to raise it sooner. In its final judgment, rendered in July 2013, the trial court granted the motion for partial summary judgment, and it denied Samson relief on its counterclaims, without stating the reasons for its rulings.

the contract, (3) the mistake occurred despite Samson's exercise of ordinary care, and (4) the rescission of the agreement would not be prejudicial.

First, we consider Samson's claim that it should be allowed to avoid the terms of its declaration, which defined the boundaries of the pool, based on the doctrine of mutual mistake.[21] *See* Tex. R. Civ. P. 166a(i) (providing that if the motion states the elements of the claim on which there is no evidence, the court must grant the motion unless the responding party "produces summary judgment evidence raising a genuine issue of material fact"). To demonstrate that a mutual mistake exists, a party must prove "the true agreement of the parties[, and] [it] must prove that the provision erroneously written into the instrument was there by mutual mistake." *Brown v. Havard*, 593 S.W.2d 939, 943 (Tex. 1980) (citing *Nat'l Resort Communities v. Cain*, 526 S.W.2d 510 (Tex. 1975)). Thus, to establish that a mistake was mutual, there must be evidence that shows both parties were acting under the same misunderstanding regarding the same material fact. *See Smith-Gilbard v. Perry*, 332 S.W.3d 709, 713 (Tex. App.—Dallas 2011, no pet.).

---

[21] The DuJay-A claimants' no-evidence motion alleges that Samson had no evidence showing that the alleged mistake in describing the boundaries of the pool associated with the DuJay-A Unit was mutual.

40

In its response to the DuJay-A claimants' no-evidence motion, Samson did not present any evidence showing that the DuJay-A claimants were acting under any misunderstanding about the depth of the pool either when their leases were pooled or when Samson filed the document that declared the pool's boundaries. Instead, the summary judgment evidence shows that the mistake was Samson's alone.

With respect to the circumstances explaining why the boundaries are declared as stated in the document that Samson filed, Samson's summary judgment evidence includes the unsworn declarations[22] of Eric Lindahl, the attorney who drafted the designation creating the DuJay-A Unit, and Richard Koenig, Samson's land manager. This evidence shows that Samson and Samson's agents were responsible for creating the document that contains the boundaries of the DuJay-A Unit's pool. Lindahl's unsworn declaration indicates that he sent Samson a draft designation of the gas unit for the DuJay-A Unit's pool in April 2003. The April 2003 draft describes the top of the pool at 6,000 feet subsurface, and the draft designates a lower boundary for the pool of 12,400 feet subsurface. In June 2003,

---

[22] Section 132.001(a) of the Texas Civil Practice and Remedies Code allows unsworn declarations to be used in lieu of affidavits in civil cases. *See* Tex. Civ. Prac. & Rem. Code Ann. § 132.001(a) (West Supp. 2014).

41

Lindahl sent Koenig a revised designation for the unit: the revised designation changed the depth of the pool's lower boundary from 12,400 feet "to depths below 12,000 feet subsurface." In his declaration, Lindahl indicates that he never intended to create a pool that overlapped with Joyce DuJay Unit's pool; he further declared, "I do not remember why the change was requested." While Lindahl indicated that he could not recall the reasons for the change in the boundaries from the boundaries reflected in a prior draft, Lindahl states that "it would have been a mistake to include depths in the [DuJay-A] Unit that were already included in the [Joyce DuJay Unit]." According to Lindahl: "It was a scrivener's error for the unit designation of the [DuJay-A] Unit not to have stated a depth limitation of 12,400 [feet]." None of the statements in Lindahl's unsworn declaration show that any of the DuJay-A claimants were involved in the drafting of the documents that led to the creation of the DuJay-A Unit's pool.

Koenig's unsworn declaration also reveals no involvement of the DuJay-A claimants in the drafting of the documents to create the DuJay-A Unit's pool. His declaration, like Lindahl's, shows that Samson and its agents were solely responsible for the filing of the document declaring the pool's boundaries. According to Koenig, Samson always intended "to designate the [DuJay-A Unit] to

have a bottom limitation of 12,400 feet subsurface." Koenig's declaration is silent about the intentions of the DuJay-A claimants and if they were consulted on sizing the DuJay-A Unit's pool. In his declaration, Koenig explains that Samson's file on the DuJay-A Unit contains an interoffice memo, dated May 2003, that contains the notation "'[r]e-routed 7-2-03 12,000' & below.'" Koenig concludes that it was a mistake not to include a lower boundary for the DuJay-A Unit's pool, but his declaration does not further discuss why Samson made the decision to change the pool's lower depth to 12,000 feet and below.

Generally, "[a] mistake by only one party to an agreement, not known to or induced by acts of the other party will not constitute grounds for relief." *Johnson v. Snell*, 504 S.W.2d 397, 399 (Tex. 1973). Additionally, the acts of Samson's attorney are attributed to Samson. *See Gavenda v. Strata Energy, Inc.*, 705 S.W.2d 690, 693 (Tex. 1986). Lindahl's suggestion that he committed a scrivener's error is also no evidence to show that the alleged mistake is one that was made by the parties mutually. *See Elizondo v. Krist*, 415 S.W.3d 259, 264 (Tex. 2013) ("[A]n attorney-expert, however well qualified, cannot defeat summary judgment if there are fatal gaps in his analysis[.]"); *McIntyre v. Ramirez*, 109 S.W.3d 741, 749-50 (Tex. 2003) ("A conclusory statement of an expert witness is insufficient to create

a question of fact to defeat summary judgment."). *Brown v. Havard*, 593 S.W.2d

939, 942 (Tex. 1980). While the declarations of Samson's attorney and its land

manager suggest that Samson made a mistake, the declarations are no evidence to

show that the mistake was one that was mutual. We conclude that the trial court

did not err by granting the DuJay-A claimants' no-evidence motion with respect to

Samson's claimed mistake.[23]

---

[23] While Samson's brief challenges the trial court's ruling on its request to reform the boundaries of the pool, its brief fails to explicitly and clearly assign error on the basis that the instrument should be reformed based on a claim of unilateral mistake. Generally, equitable relief is available to reform a contract on the basis that it contains a unilateral mistake if

> (1) the mistake is of so great a consequence that to enforce the contract as made would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake must have been made regardless of the exercise of ordinary care; and (4) the parties can be placed in status quo in the equity sense, i.e., rescission must not result in prejudice to the other party except for the loss of his bargain.

*James T. Taylor & Son, Inc. v. Arlington Indep. School Dist.*, 335 S.W.2d 371, 373 (Tex. 1960). The Texas Supreme Court has repeatedly cautioned against addressing unassigned error. *See, e.g., Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998); *Allright, Inc. v. Pearson*, 735 S.W.2d 240 (Tex. 1987). "Except for fundamental error, appellate courts are not authorized to consider issues not properly raised by the parties." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006) (citing *In re B.L.D.*, 113 S.W.3d 340, 350-52 (Tex. 2003)). In its brief, Samson does not rely on any cases that were decided based on a claim of unilateral mistake; instead, it relies on *Gail v. Berry*, 343 S.W.3d 520, 524-25 (Tex. App.—Eastland 2011, pet. denied), a case that involves a claim of mutual mistake. Thus,

*Reimbursement from Joyce DuJay Stakeholders*

Samson also asked the trial court to order the Joyce DuJay claimants to reimburse it for a portion of the damages the DuJay-A claimants were awarded in the judgment. According to Samson, the Joyce DuJay stakeholders were unjustly enriched because they benefitted from Samson's decision to attribute all of the production from the well on the Joyce DuJay lease to the Joyce DuJay Unit. Samson contends the Joyce DuJay claimants[24] should be required to disgorge $437,284, the amount that Samson asserts they received in excess of what they would have been paid had it attributed the production from the well on the Joyce DuJay lease to the stakeholders in both the Joyce DuJay and the DuJay-A Units.

---

whether the trial court erred with respect to denying relief on Samson's theory of unilateral mistake is inadequately briefed, so the claim is not further discussed. *See* Tex. R. App. P. 38.1(f), (h); Tex. R. App. P. 44.1.

[24] Samson asserts the trial court erred in denying summary judgment on its claim of unjust enrichment against the following parties that owned leases that were pooled into the Joyce DuJay Unit: Patricia Belden ($36,145); Roger and Iris Craddock ($36,145); Thomas Klorer ($36,145); Valerie Klorer ($36,145); Marlborough School ($80,693); Simpson-Omohundro Foundation ($41,404); Sara Carlson Trust ($2,713); Mark Wilson Trust ($1,356); Thomas Doran ($16,285); and the Estate of Vivian Burch ($150,253). The amounts noted are those that Samson alleges it was entitled to recover against the Joyce-DuJay-stakeholder parties, rounded to the nearest dollar.

In response to Samson's equitable reimbursement claim, the Joyce DuJay claimants, as counter-defendants, filed a motion for summary judgment on traditional and no-evidence grounds. *See* Tex. R. Civ. P. 166a(c), 166a(i). The trial court granted the Joyce DuJay motion that asserted Samson was not entitled to recover on its claim of equitable reimbursement without specifying the grounds for its ruling. When a trial court grants a motion for summary judgment without specifying the grounds on which the motion is granted, the appeals court must affirm the trial court's ruling if any of the theories presented in the summary judgment motion have merit. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

On appeal, Samson argues the trial court's ruling should be reversed because it established its claim for money had and received as a matter of law, or because the evidence in the summary judgment proceedings relevant to its claim presented issues of fact that should be resolved by a trial. A party asserting a claim for money had and received must prove that the opposing party is holding money that in equity and good conscience belongs to it. *See Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951); *Edwards v. Mid-Continent Office Distrib., L.P.*, 252 S.W.3d 833, 837 (Tex. App.—Dallas 2008, pet. denied).

First, we address Samson's argument that it presented more than a scintilla of evidence to support its claim that the Joyce DuJay claimants had money that belongs to it. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). In their no-evidence motion, the Joyce DuJay claimants challenged Samson to produce evidence that they had money that in equity belonged to Samson. In response to their no-evidence motion, Samson referred the trial court to several declarations signed by Samson's chief financial officer, C. Philip Tholen. Samson contends that Tholen's declarations demonstrate that the Joyce DuJay claimants received greater royalties than they would have received had Samson attributed the production from the well on the Joyce DuJay lease to both the Joyce DuJay and the DuJay-A Units.

In our opinion, Tholen's declarations are some evidence showing that the royalty payments to the Joyce DuJay claimants would have been smaller had Samson attributed the production for the well to both units.[25] In his January 2013 declaration, Tholen states that Samson has been paying the total amount of royalty owed pursuant to its division orders from the date the well on the Joyce DuJay

_____

[25] The Joyce DuJay claimants did not assert a bad faith pooling claim against Samson in the litigation that led to the appeal, and they have not argued that Samson could not create overlapping pools.

47

lease first produced minerals. Tholen's declaration then explains that because Samson attributed all of the production from the well on the Joyce DuJay lease to the stakeholders in the Joyce DuJay Unit, they received more than they would have received in royalties had the production been attributed to both of the units. Tholen's declaration includes various schedules and letters, and these demonstrate how much money the Joyce DuJay claimants received over what they would have been paid had Samson allocated the production from the well on the Joyce DuJay lease to both units. According to Tholen, the Joyce DuJay claimants received $437,284 more than they would have otherwise received. We conclude there is some evidence supporting Samson's claim of money had and received.

Next, we consider the grounds on which the Joyce DuJay claimants obtained summary judgment on their traditional motion. *See Knott*, 128 S.W.3d at 216; *see also Ridgway*, 135 S.W.3d at 600. With respect to their traditional motion, the Joyce DuJay claimants argued that Samson's decision to allocate the production was a decision that it made voluntarily. The Joyce DuJay claimants point out that Samson continued to allocate the production from the well on the Joyce DuJay lease solely to the Joyce DuJay Unit even after it was presented with claims and

48

sued over whether it was properly calculating the royalties due the stakeholders in the two units.

In part, as a defense to Samson's claim for reimbursement, the Joyce DuJay stakeholders' motion for summary judgment relies on the voluntary-payment rule. The voluntary-payment rule operates as a defense to a claim seeking restitution, and can be stated as follows: "'Money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, deception, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability.'" *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 768 (Tex. 2005) (citing *Pennell v. United Ins. Co.*, 243 S.W.2d 572, 576 (1951) (quoting 40 Am. Jur. § 205 (1942)).

The summary judgment motions reflect Samson's confidence in its position that the courts would revise the boundaries of the DuJay-A Unit's pool to create a pool that did share any zones with the Joyce DuJay Unit's pool. The summary judgment evidence also shows that although Samson asked the court to revise the boundaries of the DuJay-A Unit's pool, it never exercised its authority to amend the designation of the declaration, even though the designation that it filed expressly provided that Samson reserved the right to do so "in order to correct any

49

error herein[.]" We conclude that the summary judgment evidence conclusively shows that Samson's payments were voluntary and that Samson made the payments to the Joyce DuJay claimants with full knowledge of the fact that it had created units that shared significant areas of their pools, including the zone being produced by one of its wells.

Samson did not allege that any of the Joyce DuJay claimants were guilty of any acts of fraud, that it paid the royalties under duress, or that it was compelled to pay royalties over its objection to doing so. Instead, Samson continued to pay the royalties at issue to the Joyce DuJay claimants after it became involved in this litigation, which questioned whether it had properly accounted for the royalties between the two units. Under the circumstances, the summary judgment evidence conclusively established that Samson's payments of royalties to the Joyce DuJay claimants were voluntary. *See Pennell*, 243 S.W.2d at 576. We hold that the trial court did not err in granting the Joyce DuJay claimants' traditional motion for summary judgment on the grounds that Samson's payments were voluntary.

Damages

*NPRI Parties*

In its appeal, Samson contends the trial court erred when it concluded that eight of the parties (NPRI parties),[26] stakeholders in the DuJay-A Unit through their interests as nonparticipating royalty owners in the T.S. Reed lease, were entitled to collect interest on the royalties that Samson ultimately acknowledged that it owed and paid to them as stakeholders in the DuJay-A Unit. According to Samson, the awards to the NPRI parties are excessive because the awards include interest calculated from January 2002, the date the well on the Joyce DuJay lease first began producing minerals. Samson contends the interest awards should have been calculated from October 2007, the date the NPRI parties agreed with T.S. Reed's decision to allow Samson to pool its 213 acre tract into the DuJay-A Unit. In response, the NPRI parties argue that Samson waived any error with respect to

---

[26] The eight parties that own the nonparticipating royalties at issue are Cornelia Clark Akin, Florence Owens Dodington, the William Andrew Fletcher Trust, Roger Steven Holley, Sallye Jones Keith, Joseph A. Owens II, Walter R. Taber Jr., and William F. Taber. All of them trace their interest in the DuJay-A Unit's royalties to Samson's lease and the lease amendment with T.S. Reed. The record shows that in October 2007, the attorney for the NPRI parties sent Samson written ratifications of the T.S. Reed lease and the lease's amendment.

the manner the trial court calculated their interest awards because Samson failed to timely object in the trial court to the manner in which their awards were calculated.

Before evaluating the merits of Samson's argument that the awards were excessive, we consider the NPRI parties' suggestion that Samson failed to properly preserve its argument on this issue for our review on appeal. To support their claim of waiver, the NPRI parties rely on *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671 (Tex. 1979). However, in *Clear Creek*, the party that moved for summary judgment was the defendant, and the error preservation argument concerned whether the plaintiff waived its argument on appeal regarding a theory of liability that it failed to present at trial. *Id*. at 672-75.

In this case, the question is whether the NPRI parties, as the parties who moved for summary judgment, conclusively proved the amounts of their accrued unpaid royalties, which form the royalty amounts on which their awards of interest are based.[27] We construe Samson's challenge to the awards as a challenge to the sufficiency of the evidence supporting the awards. As such, Samson is allowed to raise its complaint that the awards are excessive for the first time on appeal. *See*

---

[27] The awards are listed in the trial court judgment under a column labeled "Accrued Unpaid Royalties Order," but the awards are actually for interest on the unpaid royalties because Samson paid what it owed in past royalties after the NPRI owners signed written agreements to ratify Samson's pooling of their interests.

Tex. R. App. P. 33.1(d) (allowing complaints regarding the legal or factual sufficiency of the evidence in nonjury cases, including complaints that the damages are excessive, to "be made for the first time on appeal in the complaining party's brief").

In evaluating whether the evidence on the awards to the NPRI parties was conclusive, we note that their awards are based on royalties that are calculated beginning with the date the well on the DuJay-A lease first began to produce gas. However, the NPRI owners did not act to ratify the T.S. Reed lease or the lease's amendment for several years after the well on the DuJay-A lease first produced gas.[28]

In *Montgomery v. Rittersbacher*, the Texas Supreme Court explained that an NPRI owner may ratify a lease that the holder of the executive rights made with a lessee by signing the lease or by filing suit to enforce the lease. 424 S.W.2d at 214-15. In resolving an appeal that arose from a non-jury trial, the *Montgomery* Court

---

[28] Six of the eight NPRI owners, Cornelia Clark Akin, Florence Owens Dodington, Roger Steven Holley, Joseph A. Owens II, Walter R. Taber Jr. and William F. Taber, joined the suit on June 3, 2005. The two other NPRI owners, the William Andrew Fletcher Trust and Sallye Jones Keith, joined the suit on November 16, 2006. Whether the NPRI parties' damage awards should be assessed based on the date that Samson received their written ratifications of the T.S. Reed lease or the date that each NPRI party joined the suit is a matter that the trial court should resolve based on the parties' arguments concerning that matter on remand.

noted that the NPRI owner "ratified the lease in question by filing suit; consequently, he is only entitled to receive royalties accruing from and after [ ] the date this suit was filed." *Id*. at 215.

In this case, the interest awards were calculated based on royalties that would have become due assuming the NPRI parties ratified the T.S. Reed lease as of September 2002; however, by September 2002, they had not done so and would not do so for years. Therefore, the interest awards are excessive because they exceed the amounts supported by the summary judgment evidence. We reverse the interest awards with respect to the NPRI parties, and we remand these claims to the trial court for further proceedings.

*Accrued Unpaid Royalties Awards to the Simpson-Omohundro Foundation and the*

*Marlborough School*

Samson also challenges the amounts the trial court awarded in interest to two of the stakeholders in the Joyce DuJay Unit, the Simpson-Omohundro Foundation and the Marlborough School.[29] According to Samson, the trial court's awards of interest to these two parties should be reversed because by statute, an operator of a well does not owe interest on delays that are attributable to the time

---

[29] These awards are listed under a column labeled in the judgment as "Accrued Unpaid Royalties Order."

54

the operator must spend to determine whether a party claiming an interest in the minerals to a well actually own the interest that is claimed.

Ultimately, Samson recognized that the Simpson-Omohundro Foundation and the Marlborough School were the rightful owners and entitled to participate in the distributions that it had made to the stakeholders in the Joyce DuJay Unit. While it paid the past due royalties that it determined that it owed on the production from the well on the Joyce DuJay lease, Samson refused to pay the Simpson-Omohundro Foundation and the Marlborough School interest.

The Simpson-Omohundro Foundation's and the Marlborough School's claims are based on a lease between Samson, the Simpson-Omohundro Foundation, and Nancy Long.[30] Samson argues that it does not owe interest because "there were title issues as to these parties' interests." According to Samson, the lease excused its obligation to pay interest on suspended royalties if the royalties were suspended due to title questions. In this case, the lease between

_____

[30] Nancy Omohundro Long died during the pendency of the suit; her will named the Marlborough School as the beneficiary of the residue of her estate, which included the oil and gas lease that Long executed in 2001 in Samson's favor. In 2010, the trial court granted the Marlborough School's request asking that the Marlborough School be named as a plaintiff in the action, substituting the school in the case as one of the plaintiffs in place of the executor of Long's estate. Samson did not challenge the Marlborough School's standing to recover as the beneficiary of Long's will.

Samson, the Simpson-Omohundro Foundation, and Long contains the following provision:

> Royalties payable under the terms hereof shall be due and payable to Lessor within sixty (60) days after the sale of any produce produced hereunder. Any royalties unpaid within sixty (60) days after the sale of any product produced hereunder, including suspended royalties, shall bear interest at the prevailing New York prime rare until paid.

We find nothing in the lease to support Samson's argument that its obligation to pay interest on suspended royalties was excused. The summary judgment evidence does not show that there was a bona fide dispute regarding the Simpson-Omohundro Foundation's or Nancy Long's title to the minerals in the tract that Long and the Foundation leased to Samson. There was also no evidence of a bona fide dispute that Long, through her will, had not given her interest in the lease to the Marlborough School.

Samson relies on section 91.402(b) of the Texas Natural Resources Code to justify its decision to refuse to pay any interest on the royalties that it placed in suspense. *See* Tex. Nat. Res. Code Ann. § 91.402(b) (West 2011) (allowing payment to be withheld without interest under certain circumstances, such as when there is reasonable doubt that the payee has clear title to the interest in the proceeds of production). According to the Simpson-Omohundro Foundation and the

Marlborough School, the Texas Natural Resources Code does not cancel the terms requiring Samson to pay interest on suspended royalties.

We do not read Section 91.402(b) to restrict the freedom of the parties to a lease to contract for interest payments on suspended royalties. *See id*. § 91.402(b). In this case, the leases required that Samson pay interest on suspended royalties after having determined that the royalties were due. We hold that Samson's argument reading Section 91.402(b) as canceling the interest terms of the lease is without merit.

With respect to the judgment's award of interest on suspended royalties,[31] we affirm the trial court's awards to the Simpson-Omohundro Foundation and the Marlborough School. We overrule Samson's arguments that the trial court erred in awarding the Simpson-Omohundro Foundation and the Marlborough School interest on suspended royalties.

---

[31] The Simpson-Omohundro Foundation and the Marlborough School were also awarded principal and interest on their claims that they were damaged by Samson's failure to pay them royalties based on the production from the Black-Stone-lease well under a column in the final judgment that is labeled "Unpooling Order." We have reversed these awards and rendered judgment on them in Samson's favor.

*Remaining Damages Arguments*

Samson raises three additional arguments that suggest the evidence does not support the amount the trial court awarded in damages to the DuJay-A claimants.[32] First, Samson argues that the trial court erroneously calculated the awards because the awards include damages that were based on royalties before the T.S. Reed lease became effective in April 2002. Second, and alternatively, Samson contends that the trial court's awards include damages based on royalties for gas produced before the DuJay-A Unit existed. Third, Samson argues the trial court erred by awarding interest to the DuJay-A claimants based on the rates of interest that exceed the rates of interest that are found in section 91.403 of the Texas Natural Resources Code. Tex. Nat. Res. Code Ann. § 91.403 (West 2011).

---

[32] The damage awards challenged in this section of Samson's brief concern the principal and interest that the trial court awarded to T.S. Reed Properties, Cornelia Clark Akin, Patricia Gardner Deland, Florence Owens Dodington, the William Andrew Fletcher Trust, Roger Steven Holley, Sallye Jones Keith, Joseph A. Owens II, William R. Taber, Jr., William F. Taber, and Cecil Taber Ward on their claims alleging that Samson failed to attribute any of the production from the well on the Joyce DuJay lease to the DuJay-A Unit. The awards are listed under a column in the final judgment that is labeled "Tract 1 Order."

58

In resolving whether the trial court properly calculated the royalty payments at issue, we look to the terms of the parties' lease. *Tittizer v. Union Gas Corp.,* 171 S.W.3d 857, 860 (Tex. 2005). The T.S. Reed lease established the deadlines by which royalties became due.[33] Significantly, nothing in the lease indicates that the parties made the deadline by which Samson was required to tender royalties contingent on the date the lease became effective. Samson's argument that no royalties were earned prior to April 2002 is not supported by the language in the lease.

Samson also argues that the trial court's damages awards include damages for production that dates from January 2002, despite the fact that the DuJay-A Unit was created months later and the filing that created the unit made the unit effective as of first production from the well on the DuJay-A lease, a well that Samson did not complete until September 2002. *See generally Hooks*, 457 S.W.3d at 65 (noting that the language in a unit designation made the designation of the unit effective as of date of first production). However, the designation Samson filed to create the

---

[33] Section IV of the T.S. Reed Properties lease, executed in November 2001, contains an express provision that addresses Samson's obligation to pay royalties. Under the lease, the royalties "that may become due hereunder" were required to be paid on the last day of the month following the month of production for oil and before the last day of the second month for the production of gas.

DuJay-A Unit declares that the Unit is "effective as of the date of first production of the [DuJay-A] Well," even though the declaration was actually filed after the date the well on the DuJay-A lease began producing gas. From the information in the summary judgment evidence, it appears that the well on the DuJay-A lease first began producing gas on October 13, 2002.[34]

In this case, the trial court's damages awards include damages that are calculated based on the royalties the DuJay-A claimants were owed on gas produced before the date the DuJay-A Unit existed. We agree with Samson that the damages awarded to the DuJay-A claimants exceed the amounts the summary judgment evidence supports. We reverse the principal and interest awards to the DuJay-A claimants because the awards are excessive, and we remand the case for further proceedings so the awards can be calculated properly.

Third, with respect to the damages award, Samson also contends that the DuJay-A claimants were awarded interest at rates that are higher than the rates allowed by Texas law. According to Samson, the prime rate of interest, at the time, exceeded the interest rate found in section 91.403 of the Texas Natural Resources

_____

[34] We have identified the date of first production on the well on the DuJay-A lease from a report that Samson filed with a regulatory agency. However, on remand, the parties may provide the trial court with additional evidence, if needed, to further clarify this date.

Code. Tex. Nat. Res. Code Ann. § 91.403 (West 2011) (providing for the payment of interest at "two percentage points above the percentage rate charged on loans to depository institutions by the New York Federal Reserve Bank, unless a different rate of interest is specified in a written agreement between payor and payee").

Under the T.S. Reed lease, which provides a rate of interest that Samson was obligated to pay on royalties, the parties agreed that Samson would pay interest at "the prime rate of interest at Chase-Manhattan Bank in New York City, New York, plus 2% (not to exceed legal Texas interest rate)[.]" According to the DuJay-A claimants, the "not to exceed" language of the provision was intended to reference the maximum interest allowable under section 303.009 of the Texas Finance Code. *See* Tex. Fin. Code Ann. § 303.009 (West Supp. 2014) (providing a maximum ceiling for interest rates that vary, based on sections 303.009(a)-(f), from eighteen percent to twenty-eight percent a year).

In our opinion, the "not to exceed" provision of the lease was intended to reference the Texas Finance Code, not the Texas Natural Resource Code. Under the Texas Natural Resource Code, the interest rate provided by that Code does not apply if the parties have specified a rate of interest under their written agreement. *See* Tex. Nat. Res. Code Ann. § 91.403(a). The T.S. Reed lease specifies a rate of

interest, so the parties presumably did not intend for the provisions in the Texas Natural Resource Code to apply. *Id.*

The Texas Finance Code creates a maximum rate of interest that generally applies to all contracts, unless the parties have provided for another rate that is specified by the contract. *See* Tex. Fin. Code Ann. art. § 302.001(b) (West 2006); *id*. § 303.001 (West. Supp. 2014). Given that the Texas Finance Code provides for a maximum rate of interest unless some other maximum rate is provided for by contract, and that the parties specified a rate of interest that was to apply to past due royalties that became due, we conclude that "not to exceed" provision refers to the maximum interest rate provided under the Texas Finance Code.

Samson does not argue that the interest rates applied by the trial court were rates in excess of the ceilings found in the Texas Finance Code. We conclude Samson's argument that the trial court applied the wrong rate of interest to be without merit, and it is overruled. Nevertheless, as the interest awards were based on awards that were excessive for the reason we have explained, the interest awards to the DuJay-A claimants are also reversed and remanded for further proceedings consistent with the Court's opinion.

In a cross-appeal, the DuJay-A claimants argue that the trial court's awards underestimate the damages they conclusively proved that they suffered based on Samson's breach. According to the DuJay-A claimants, the trial court erred by adjusting their damages to reflect the fact that they do not own all of the minerals on the 213 acre tract that Samson leased. In response, Samson contends the lease required the trial court to account for the DuJay-A claimant's partial ownership of the minerals to the tract.

Section VIII(b) of the T.S. Reed Properties lease provides that Samson was to compute the royalty on production from wells within the pooled unit as follows:

> **(b) Computing Royalties.** For the purpose of computing the royalties to which owners of royalties and payments out of production shall be entitled on production of oil and gas, or either of them, from the pooled unit, there shall be allocated to the land covered by this lease and included in said unit a pro rata portion of the oil and gas, or either of them, produced from the pooled unit after deducting that used for operations on the pooled unit. Such allocation shall be on an acreage basis, that is, there shall be allocated to the acreage covered by this lease and included in the pooled unit that pro rata portion of the oil and gas, or either of them, produced from the pooled unit which the number of surface acres covered by this lease and included in the pooled unit bears to the total number of surface areas included in the pooled unit. Royalties hereunder shall be computed on the portion of such production, whether it be oil and gas, or either of them, so allocated to the land covered by this lease and included in the unit, just as though such production were from such land.

In addition to this provision, the lease between Samson and T.S. Reed includes a proportionate reduction clause. Section XIII, the proportionate reduction clause, provides:

> [I]f this lease covers a less interest in the oil and gas in all or any part of the leased premises than the entire undivided fee simple estate, then the royalties, delay rental, and other monies accruing from any part as to which this lease covers less than such full interest shall be paid only in the proportion which the interest therein covered by this lease bears to the whole or undivided fee simple estate therein.

The DuJay-A claimants contend that section XIII does not apply because T.S. Reed Properties leased only the "net mineral acres" to Samson when it leased the tract. While the attachments to the lease do describe the net mineral acres in the tract that T.S. Reed Properties owned, the lease also has a proportionate reduction clause that applies to the royalties due to the lessor under the lease. Essentially, the DuJay-A claimants argue that the proportionate reduction clause is superfluous.

T.S. Reed relies primarily on *Texas Co. v. Parks*, 247 S.W.2d 179 (Tex. Civ. App.—Fort Worth 1952, writ ref'd n.r.e), to support its construction of the lease. In *Parks*, the Fort Worth Court of Appeals held that a proportionate reduction clause did not apply to reduce the lessor's obligation to pay delay rentals of $160, yearly. *Id*. at 182. Given the purpose of the delay rental provision, and that it was to be

paid yearly, the *Parks* Court concluded that the agreement required the lessor pay "an annual rental of $160 for their interest conveyed." *Id*. While the DuJay-A claimants are correct that the *Parks* Court refused to reduce the delay rentals based on the proportionate reduction clause of the lease, *Parks* is a case that involved delay rentals, not royalties. *Id*. In this lease, the proportionate reduction clause specifically applies to both royalties and delay rentals. We conclude that *Parks* is not relevant to the construction of the lease terms at issue here.

With respect to the T.S. Reed lease, the description of the tract in a document the parties attached to the lease describes the tract as "all that certain land," which is then described in another exhibit to the lease. The exhibit referenced by the attachment describes the tract's surface acreage, the survey where the tract is located, the abstract number associated with the tract, the volume and page number of the deed records where a deed describing the tract can be found, and T.S. Reed's net mineral interest in the tract. In other words, the exhibit is descriptive of the property conveyed; it does not alter the parties' bargain that T.S. Reed was to be paid royalties on the only minerals that it owned and leased in the tract.

The Texas Supreme Court has explained that "'[l]and' is the physical earth in its natural state, while an estate in land is a legal unit of ownership in the physical land." *Averyt v. Grande, Inc.*, 717 S.W.2d 891, 894 (Tex. 1986) (citing 1 Thompson, THOMPSON ON REAL PROPERTY § 52 (1939)). Given the language of the T.S. Reed Properties lease, the lease conveyed to Samson the right to use the entire surface for the purpose of exploring and producing oil and gas. Looking at the lease as a whole, from the granting clause to the reservation clause, it is evident that the term "all that certain land" does not refer to T.S. Reed's mineral estate but to the entire tract. *Compare King v. First Nat'l Bank of Wichita Falls*, 192 S.W.2d 260, 263 (Tex. 1946).

Although Samson and the DuJay-A claimants interpret the lease differently, neither argues that the proportionate reduction provision of the lease is ambiguous. When an oil and gas lease is unambiguous, the lease must be enforced based on its unambiguous terms. *Tittizer*, 171 S.W.3d at 860. We hold that the trial court did not misconstrue the lease, and that it properly applied the proportionate reduction clause in calculating the DuJay-A claimants' damages. The DuJay-A claimants' issue in its cross-appeal is overruled.

## Conclusion

We reverse and render judgment in favor of Samson with respect to the trial court's order granting awards to Patricia Belden; Roger Craddock and Iris Klorer Craddock, Individually and as Trustees of the Craddock Family Trust; Thomas Klorer; Valerie Klorer; Marlborough School, Simpson-Omohundro Foundation, the Sara Wilson Carlson Exempt Trust, through Capital One, N.A., its trustee; the Mark C. Wilson Grantor Trust, through Capital One, N.A., its trustee; Thomas Edwin Doran; and Gary Cruse, as Executor of the Estate of Vivian Burch.[35] However, with respect to the trial court's awards for interest on suspended royalties to the Simpson-Omohundro Foundation and the Marlborough School, the trial court's awards are affirmed.[36]

We also reverse all of the trial court's awards to the DuJay-A claimants because the awards are excessive, and they are remanded to the trial court for further proceedings consistent with the Court's opinion. Finally, with respect to those parties to the judgment who did not appeal, the judgment is affirmed.

---

[35] These awards are listed under the column in the final judgment that is labeled "Unpooling Order."

[36] These two awards are listed under the column in the final judgment that is labelled "Accrued Unpaid Royalties Order."

AFFIRMED IN PART, REVERSED AND RENDERED IN PART, REVERSED AND REMANDED IN PART.


_____
HOLLIS HORTON
Justice


Submitted on May 29, 2014
Opinion Delivered October 22, 2015
Before McKeithen, C.J., Kreger, and Horton, JJ.