

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

## No. 08-19-00124-CV

---

**MRC Permian Company, Appellant/Cross-Appellee**

v.

**Point Energy Partners Permian LLC; TJ Bar, LLC; Tubb Memorial,
an Oregon Limited Partnership; PlainsCapital Bank, Trustee for the
Debora Jackson Revocable Trust; Bank of America N.A., Trustee for the
Janelle Jackson Marital Trust Part M2, Janelle Jackson Marital Trust Part M1,
and Family Credit Shelter Trust Part B; Vortus Investment Advisors,
LLC; John Sabia; and Bryan Moody, Appellees/Cross-Appellants**

---

On Appeal from the 143rd District Court
Loving County, Texas
Trial Court No. 17-06-869

# OPINION

This permissive appeal concerning an oil-and-gas lease returns to us on remand from the Texas Supreme Court.[1] We determine that the scope on remand encompasses two issues: (1) whether the doctrine of quasi-estoppel saves the lease based on the lessors' acceptance of royalty payments; and (2) how the retained-acreage clause is properly construed—specifically how acreage is tied to the horizontal length of the wellbore. We hold that quasi-estoppel does not apply to save the lease, and we construe the retained-acreage clause to require measurement of the length of the wellbore from the point of penetration into the producing formation to its terminus. Applying that construction, we further hold that Appellant/Cross-Appellee MRC Permian Company retained 704 acres of the leasehold estate as reflected in its recorded production-unit designations. We remand for an accounting and further proceedings relating to Appellees/Cross-Appellants' breach-of-contract counterclaim.

## I. BACKGROUND

### A. Factual background

In 2014, the Lessors[2] executed four identical leases (collectively, the Lease) granting MRC an exclusive right to develop and produce oil and gas on about 4,000 acres in Loving County.[3] The Lease provided that MRC would maintain its leasehold after the three-year primary term through continuous drilling, defined as spudding[4] a new well within 180 days of the prior well. A force

---

[1] *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 813 (Tex. 2023).

[2] The Lessors are (1) TJ Bar, LLC and its agent Holland Acquisitions, Inc., d/b/a Holland Services; (2) Tubb Memorial, LP and its agent Bank of America, N.A.; (3) The Deborah Jackson Revocable Trust and its trustee PlainsCapital Bank; and (4) Janelle Jackson Marital Trust Part M2, Janelle Jackson Marital Trust Part M1, and Family Credit Shelter Trust Part B, with Bank of America, N.A. as their trustee.

[3] Because the four leases are identical, we treat them collectively as a single lease. The leased area covered: "[a]ll of Sections 5, 6, 7, 12, 17 and 18, Block C-24, PSL Survey, Loving County, Texas."

[4] "Spudding" or "spudding-in" is a term of art in the oil-and-gas industry that means "[t]he first boring of the hole in the drilling of an oil well." *Point Energy*, 669 S.W.3d at 800 n.2.

majeure clause provided that the continuous-drilling deadline would be extended in the event of a non-economic event beyond its control delaying its operations. The Lease then provided that if MRC failed to spud a well on time, its leasehold would terminate outside of designated "Production Units" as defined in the retained-acreage clause.

The retained-acreage clause entitled MRC to designate one Production Unit for each commercial well it drilled by drawing a rectangle around it on a plat, subject to certain size limits. For horizontal oil wells, the Lease provided that each Production Unit may not exceed 160 acres plus 10% tolerance (176 acres), or 320 acres plus 10% tolerance (352 acres) if the wellbore extended more than 5,000 feet horizontally in the producing formation. It further required MRC to file a copy of its designation in the county where the well was located within 90 days of completion of each well, and to "promptly furnish" to the Lessors a copy of the designation showing recording information. Upon termination, MRC was entitled to retain the acreage included in the designated Production Units, with each unit "treated for all purposes as being covered by a separate lease containing all of the terms and provisions set out herein."

MRC drilled five horizontal oil wells during the primary term of the Lease. It is undisputed that MRC did not file a written designation of Production Units within 90 days after drilling completion of those wells. The parties' dispute arose when MRC mis-calendared the deadline to spud a sixth well. MRC discovered the error after the deadline had passed, at which point it gave notice to the Lessors of a purported force majeure event involving "operational issues" with its intended rig. Acting on behalf of the Lessors, Point Energy Partners, LLC—an operator seeking to replace MRC under new leases with the Lessors—responded by demanding proof that the Lease had not terminated notwithstanding the asserted force majeure event.

## B. Procedural background

On June 20, 2017, MRC filed suit against Point Energy[5] and the Lessors, as well as their affiliates, trustees, and agents, bringing claims for trespass-to-try-title, breach of contract, tortious interference with its contractual rights under the Lease, and declaratory relief including a declaration that MRC's Lease was in full force and effect. Appellees/Cross-Appellants (collectively, Point Energy) answered with affirmative defenses, including waiver, estoppel, and release, among others, and counterclaims for trespass-to-try-title, breach of contract for MRC's failure to release its interest in the leasehold estate upon completion of drilling as required by the Lease, the imposition of a constructive trust, and an accounting. MRC replied with its own affirmative defenses, including force majeure and quasi-estoppel, contending the Lessors had continued to accept royalty payments, thereby estopping Point Energy from maintaining that the Lease had terminated; in addition, as a defense to Point Energy's breach-of-contract claim, MRC contended the Lessors had repudiated the Lease, thereby absolving MRC from paying damages for any such breach.

In April 2018, and again in January 2019, while the litigation was pending, MRC filed designations of Production Units containing five of its producing commercial wells—one Production Unit covering the western half of Section 18 and containing the Totum #211H Well and one Production Unit covering the western half of Section 12 that contains four stacked wells, the Jackson Trust #021H, #101H, #121H, and #211H Wells (collectively, the Jackson Trust

---

[5] Appellees/Cross-Appellants include Point Energy's principals, John Sabia and Bryan Moody, along with Vortus Investment Advisors, LLC (Vortus), a financial backer of Point Energy.

Wells).[6] In its designations, MRC claimed 352 acres for each of the Production Units, for a total of 704 acres.

The parties filed two sets of cross-motions for summary judgment. In its motions, MRC sought a declaration that the Lease was extended by force majeure and dismissal of Point Energy's claims and affirmative defenses. In its motions, Point Energy sought a declaration that the Lease was not extended by force majeure, a judgment of title as to most of the leased acreage, an accounting, and a constructive trust. In Point Energy's request for a judgment of title, it acknowledged that MRC was entitled to retain Production Units for the wells in question but argued that MRC was limited to 160 acres for each well, without addressing tolerance acreage.[7] It further argued that MRC had waived its right to claim any amount over 160 acres in each Production Unit by failing to file a timely designation of the Production Units with the county. In its summary judgment response, MRC argued that, even if Point were correct that the Lease terminated as to most of the leased acreage, MRC remained entitled to 352 acres in each Production Unit under the retained-acreage clause.

The trial court below issued an omnibus order ruling on the parties' cross-motions for summary judgment, in which it: (1) held MRC's Lease terminated in May 2017 as to all acreage outside of Production Units, notwithstanding MRC's force majeure and quasi-estoppel defenses; (2) granted Point Energy summary judgment on MRC's tortious-interference claim; (3) denied MRC summary judgment on Point Energy's counterclaims and granted Point Energy's motion on

---

[6] MRC filed a single designation of the Production Unit containing the Jackson Trust Wells in April 2018. It then filed separate designations for those four wells in January 2019, each designating a Production Unit within the boundaries of the same 352-acre Production Unit designated in April 2018. MRC thus claims a single Production Unit for the Jackson Trust Wells.

[7] We note that Point Energy did argue in its initial answer to MRC's lawsuit that MRC waived its claim to a 10% tolerance by not timely designating the Production Units. But as explained below, Point Energy does not carry forward this specific argument on appeal.

MRC's repudiation defense; (4) rejected Point Energy's arguments that MRC had waived its right to claim the contested acreage in its Production Units due to its failure to timely designate the Production Units as required by the Lease; and (5) rejected Point Energy's method of determining the size of the Production Units MRC retained. Although the trial court concluded the retained-acreage clause was unambiguous and it rejected Point Energy's measurement method, it nonetheless did not specify the size of the Production Units retained by MRC under the retained-acreage clause.

The trial court then permitted an interlocutory appeal under Texas Civil Practice and Remedies Code § 51.014(d), identifying three controlling questions of law: (1) whether MRC's Lease terminated as to acreage not included in Production Units as of May 22, 2017; (2) what is the size of the Production Units; and (3) if the Lease did not terminate, whether MRC offered sufficient evidence of tortious interference. This Court exercised its discretion to accept the appeal.

In our first opinion, we held a fact issue remained on force majeure and reversed the grant of summary judgment on that issue; we otherwise declined to reach MRC's quasi-estoppel defense or its retained-acreage dispute, affirmed the denial of summary judgment on Point Energy's breach-of-contract counterclaim and MRC's repudiation defense to that counterclaim, and reversed the grant of summary judgment on MRC's tortious-interference claim. *MRC Permian Co. v. Point Energy Partners Permian LLC*, 624 S.W.3d 643, 651 (Tex. App.—El Paso 2021), *rev'd in part*, 669 S.W.3d 796 (Tex. 2023).

On petition for review, the Texas Supreme Court held force majeure did not apply as a matter of law and it rendered partial judgment that the Lease terminated in May 2017 as to the portion of the leasehold estate not included in Production Units; it further held MRC lacked a tortious-interference claim as to the Lease in its entirety but a fact question remained as to tortious

6

interference regarding retained acreage; and it remanded the issues of quasi-estoppel and retained-acreage size to this Court. *Point Energy*, 669 S.W.3d at 811–13.[8]

## II. SCOPE OF APPEAL ON REMAND

As a preliminary matter, we determine the scope of the appeal on remand. Two issues are straightforward: the parties agree we should address the size of retained acreage as certified by the trial court and as instructed by the Texas Supreme Court; and MRC has informed us it no longer is pursuing a tortious-interference claim. Otherwise, the parties dispute whether we should consider two other issues. MRC contends Point Energy's breach-of-contract counterclaim falls within the scope of the appeal, and that the issue of quasi-estoppel also falls within its scope as it relates to the lease-termination issue. Point Energy argues instead that the breach-of-contract counterclaim is outside the scope of the appeal, and that MRC waived its quasi-estoppel defense because it did not address the issue in its initial brief. As explained below, we conclude the issue of quasi-estoppel falls within the scope of the appeal, and MRC did not waive the issue. However, we conclude the breach-of-contract counterclaim does not fall within the scope of the appeal.

### A. Applicable law

The Texas Civil Practice and Remedies Code provides that a trial court may permit an interlocutory appeal from an order if: "(1) the order to be appealed involves a controlling question of law as to which there is a substantial ground for difference of opinion; and (2) an immediate

---

[8] In its judgment, the Texas Supreme Court stated that the court of appeals' judgment should be reversed, and that it is therefore ordered that: "1) The portions of the court of appeals' judgment regarding the termination of [MRC's] leases and [MRC's] tortious interference claims, except as to Petitioner TJ Bar are reversed; 2) The portions of the court of appeals' judgment regarding [Point Energy's] counterclaim for breach of contract, [MRC's] repudiation defense, and [MRC's] tortious-interference claim against Petitioner TJ Bar, having not been challenged in this Court, remain in effect; 3) Partial judgment is rendered for [Point Energy] that (i) [MRC's] leases were not extended by operation of their force majeure clauses [as of] May 22, 2017, as to the portion of the leasehold estate not included in production units and (ii) [MRC] shall take nothing on its tortious interference claims to the extent those claims are based on the lease's continued validity by virtue of the force majeure clauses; 4) The cause is remanded to the court of appeals for further proceedings consistent with this Court's opinion; and 5) [Point Energy] shall recover, and [MRC] shall pay, the costs incurred in this Court."

appeal from the order may materially advance the ultimate termination of the litigation." Tex. Civ. Prac. & Rem. Code Ann. § 51.014 (d)(1)(2). An appellate court then has discretion to accept or deny a permissive appeal, either in whole or in part. *Id.* § 51.014(f); *see Indus. Specialists, LLC v. Blanchard Ref. Co. LLC*, 652 S.W.3d 11, 17–18 (Tex. 2022) (reaffirming that courts of appeals have discretion to accept or deny an appeal as the trial court's conclusion that prerequisites have been met has no bearing on the court of appeals' subsequent evaluation).

Subsection (d) of the permissive appeal statute provides that a permissive appeal is from the "order" itself; therefore, once a court of appeals has accepted a permissive appeal, the court may, and should, address "all fairly included subsidiary issues and ancillary issues pertinent to resolving the controlling legal issue" set forth in the order. *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 147 (Tex. 2022) (citing Tex. Civ. Prac. & Rem. Code Ann. § 51.014 (d) and Tex. R. App. P. 38.1, 53.2); *see also Tex. Disposal Sys. Landfill, Inc. v. Travis Cent. Appraisal Dist. by & through Crigler*, 694 S.W.3d 752, 761 (Tex. 2024) (recognizing that in a permissive appeal, "the court of appeals' jurisdiction extends to the entire order, without a limit on any examination of subsidiary issues"). But as the Texas Supreme Court has recognized, in some instances, a permissive appeal may be circumscribed by the trial court's identification of only a "portion" of an order that contains the controlling question of law to be reviewed by the court of appeals.[9]

---

[9] This recognition is consistent with the federal courts' interpretation of the virtually identical federal counterpart to the Texas permissive appeal statute. *See* 28 U.S. Code § 1292. The U.S. Supreme Court has held the same statutory language provides that "appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court"; nonetheless, "[t]he court of appeals may not reach beyond the certified order to address other orders made in the case." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996). Some federal courts have recognized this allows for the division of orders into appealable and non-appealable portions, thereby limiting the scope of the appeal to only the portions of the order that the trial court identified as involving a controlling question of law. *See Little v. Louisville Gas & Elec. Co.*, 805 F.3d 695, 699 (6th Cir. 2015) (holding that the word "order" as used in the federal permissive appeal statute does not necessarily include the entire document, and a trial court may therefore certify only a "portion" of an order for appeal); *Jackson v. City of Houston*, 143 F.4th 640, 644–45 (5th Cir. 2025) (recognizing that jurisdiction extends to "all questions that are material to that certified order" but that the term, "order," for purposes of § 1292(b), does not necessarily encompass everything in the district court document labeled "Order," and instead, it refers to the "district court's direction or command

8

*Elephant Ins. Co., LLC*, 644 S.W.3d at 147 (recognizing that"[w]hile 'involve[ment]' of a controlling legal issue is essential to securing a permissive appeal," the statute plainly provides that it is the order, or in some instances, "the relevant portion of the order" that is on appeal); *see also BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 195 n.4 (Tex. 2021) (observing that because the trial court's identification of the '"controlling question[s] of law' for the permissive appeal include[d] ratification but not estoppel . . . the court of appeals declined to address [the defendant's] separate estoppel arguments, as do we"). Thus, when a trial court enters an omnibus order containing multiple rulings, but only certifies certain rulings as involving a controlling legal question for purposes of a permissive appeal, an appellate court acts properly in declining to consider issues that do not relate to the certified question. *See BPX Operating*, 629 S.W.3d at 195 n.4 (declining to address uncertified issues); *Indus. Specialists*, 652 S.W.3d at 26 (Busby, J., dissenting) (recognizing that appellate courts "generally decline to address issues not specified in the trial court's order").

### B. Analysis

#### (1) The quasi-estoppel issue is included in the scope of the appeal and was not waived

Applying these principles, we held in a June 3, 2025 order that the issue of quasi-estoppel was "plainly" included in the trial court's omnibus order on appeal and presented a controlling question of law as designated by the trial court. In particular, we noted the trial court expressly certified the question of whether the Lease terminated in May 2017, and MRC's claim that quasi-estoppel prevented the lease from terminating was a subsidiary or ancillary question involving the

---

resolving a discrete motion or claim"); *see also Indus. Specialists, LLC v. Blanchard Ref. Co. LLC*, 652 S.W.3d 11, 22 (Tex. 2022) (recognizing that the Texas Legislature modeled subsection (b) on the federal permissive appeal statute found in 28 U.S.C. § 1292(b), which contains virtually identical terminology).

9

lease-termination issue. We therefore ordered supplemental briefing on that issue. No party suggests the issue of quasi-estoppel does not relate to the controlling question of whether the Lease terminated.

Point Energy nonetheless argues that MRC waived the issue of quasi-estoppel by failing to raise it in its initial brief. We rejected that argument in our June 3 order, noting that when an issue is squarely before us in a permissive appeal—as was the issue of lease termination—we may order the parties to furnish us with supplemental briefing on the merits of the issue to assist us in our resolution of the appeal. *See Bertucci v. Watkins*, 709 S.W.3d 534, 542 (Tex. 2025) (recognizing that because "briefing may be adequate to preserve an issue but insufficient to properly assist an appellate court . . . our appellate-procedure rules permit courts to 'require additional briefing' if 'the case has not been properly presented in the briefs'") (citing Tex. R. App. P. 38.9(b) ("If the court determines, either before or after submission, that the case has not been properly presented in the briefs, or that the law and authorities have not been properly cited in the briefs, the court may postpone submission, require additional briefing, and make any other order necessary for a satisfactory submission of the case.")); *see also* Tex. R. App. P. 38.7 ("A brief may be amended or supplemented whenever justice requires, on whatever reasonable terms the court may prescribe."); *Costley v. State Farm Fire & Cas. Co.*, 894 S.W.2d 380, 389 (Tex. App.—Amarillo 1994, writ denied) (concluding that it is within the discretion of an appellate court to permit the filing of supplemental briefs "when justice requires" and rejecting objection that issue raised in supplemental brief on remand was waived).

In addition to the fact that the quasi-estoppel issue is clearly before us, we note that resolving the issue in this permissive appeal will fundamentally advance the termination of the litigation because it is the final key to resolving the parties' title dispute over all but the Production

10

Units to which MRC may be entitled. Tex. Civ. Prac. & Rem. Code Ann. § 51.014 (d)(1)(2). We therefore consider the issue of quasi-estoppel in this appeal.

### (2) Point Energy's counterclaim is not within the scope of the appeal

By contrast, the breach-of-contract issue is entirely separate from the overarching title issue, as it involves the question of whether Point Energy is entitled to damages due to MRC's alleged failure to timely release its interest in the leasehold estate after it ceased drilling, as required by the Lease. That issue is not fairly subsidiary, ancillary, or pertinent to resolving the controlling questions identified by the trial court—that is, the questions of whether the Lease terminated and the size of the Production Units to which MRC is entitled under the retained acreage clause. *Elephant*, 644 S.W.3d at 147 (citing Tex. R. App. P. 38.1 and 53.2).

Just as the Supreme Court noted in *Elephant* that it is improper for an appellate court to unduly constrain its analysis of the legal questions and issues presented in a permissive appeal, so too would it be imprudent in this instance to go outside the scope of what the Legislature intended in such an appeal and address issues wholly unrelated to the controlling questions of law identified by the trial court; doing so would, in effect, require us to treat this permissive appeal no differently than a final judgment. Accordingly, on this record, we decline to address the trial court's ruling on Point Energy's breach-of-contract counterclaim.

In sum, the issues before us are: (1) whether MRC's quasi-estoppel defense saves the Lease and (2) if the Lease did terminate, what are the sizes of the Production Units to which MRC is entitled under the Lease's retained-acreage clause.

### III. THE QUASI-ESTOPPEL DEFENSE

MRC contends the trial court erred in granting Point Energy's motion for summary judgment on its defense of quasi-estoppel. On this issue, MRC argues that the Lessors continued to accept royalty payments after the Lease terminated in May 2017, and it would be unconscionable

11

to permit Point Energy to claim: "on the one hand that the leases terminated while accepting millions of dollars in royalties as if the leases had not." But as Point Energy points out, the evidence shows MRC paid $900,000 in royalty checks with full knowledge of Point Energy's assertion of lease termination. On review, we agree with the trial court that quasi-estoppel is not available based on the facts and circumstances presented.

## A. Standard of review

We review summary judgments de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Point Energy filed a hybrid no-evidence and traditional motion. *See Mitchell v. MAP Res., Inc.*, 649 S.W.3d 180, 187 n.6 (Tex. 2022). Although we generally address no-evidence grounds first, when both parties bring forth summary judgment evidence, the differing burdens are immaterial, and the ultimate issue is whether a fact issue exists. *Neely v. Wilson*, 418 S.W.3d 52, 61 (Tex. 2013), *superseded by statute on unrelated issue as stated in Scripps NP Operating, LLC v Carter*, 573 S.W.3d 781, 791 (Tex. 2019). Here, because both parties submitted evidence, we confine our review to the traditional ground: whether the record shows there is no genuine issue of material fact and MRC's quasi-estoppel defense fails as a matter of law. Tex. R. Civ. P. 166a(c).

## B. Applicable law

Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Lopez v. Muñoz, Hockema & Reed*, L.L.P., 22 S.W.3d 857, 864 (Tex. 2000). Acceptance of benefits is a type of quasi-estoppel that applies when it would be unconscionable to allow a party to maintain a position inconsistent with one to which the party acquiesced, or from which the party accepted a benefit. *Id.* Quasi-estoppel is an equitable defense; juries resolve any contested predicate facts, but equitable relief is for the court to

12

determine. *State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979); *see also Kramer v. Kastleman*, 508 S.W.3d 211, 217 (Tex. 2017) (addressing quasi-estoppel based on acceptance of benefits, courts must "refrain from adherence to formulaic principles and hard-line rules that are inconsonant with the doctrine's equitable nature").

Unlike equitable estoppel, quasi-estoppel does not require misrepresentation by the estopped party and ignorance or reliance by the other party as essential elements. *Fasken Land & Minerals, Ltd. v. Occidental Permian Ltd.*, 225 S.W.3d 577, 593–94 (Tex. App.—El Paso 2005, pet. denied) (citing *El Paso Nat. Bank v. Sw. Numismatic Inv. Group, Ltd.*, 548 S.W.2d 942, 948 (Tex. App.—El Paso 1977, no writ). The parties' relative knowledge, however, is relevant in determining whether quasi-estoppel is appropriate. *See Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex. 1971) (estopped party must have knowledge of all material facts at the time of acceptance); *Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 338 (Tex. 2020) (where party asserting quasi-estoppel was "fully aware" of inconsistent easement and replat when it proceeded to purchase property, it was "difficult to see how the inconsistency is 'unconscionable'").

### C. Analysis

We focus our analysis on two dispositive factors: (1) what MRC knew when it made the royalty payments, and (2) what Point Energy knew when the payments were received.[10] The undisputed record shows MRC issued the payments after receiving notice of the Lessors' position

---

[10] The record shows the Lessors assigned certain rights related to the litigation to Point Energy, authorizing Point Energy to file suit on their behalf—subject to an unrecorded and undated Indemnity and Cooperation Agreement that is not in the record. While post-assignment acceptance of benefits by assignors of the leased property would normally not support quasi-estoppel, *see Mitchell v. Simms*, 63 S.W.2d 371 (Tex. Comm'n App. 1933, opinion approved) (holding that acceptance of delay rentals by assignor did not affect title of assignees whereas acceptance of delay rentals by lessors was sufficient to establish quasi-estoppel), at least one court has held the doctrine may still apply where the assignor and assignee entered a separate agreement regarding the application of royalties. *McCoy v. Texon Royalty Co.*, 124 S.W.2d 877, 881 (Tex. App.—San Antonio 1939, writ dism'd judgm't cor.). We need not address this issue as we find that quasi-estoppel fails on other grounds.

that the Lease had terminated and while the parties were actively litigating that issue. The Lessors only deposited the royalty checks after sending MRC reservation-of-rights letters that reiterated their termination claim. The letters explained that, in the event the Lease was held not to have terminated, the royalty checks would offset damages in the amount of production from retained acreage, subject to an accounting.

Even assuming the acceptance of the royalty checks was inconsistent with Point Energy's assertion that the Lease terminated, the combined notice—pleadings and contemporaneous reservations—demonstrates MRC issued the checks while fully aware of the inconsistency. *Samson Expl., LLC v. T.S. Reed Properties, Inc.*, 521 S.W.3d 26, 41–42 (Tex. App.—Beaumont 2015), *aff'd*, 521 S.W.3d 766 (Tex. 2017) (no quasi-estoppel where lessee continued making royalty payments even after the suit was filed and checks did not indicate full and final settlement, indicating the defendant "calculated that it would derive a greater benefit from refusing to . . . correct its alleged mistake"); *BPX*, 629 S.W.3d at 200–01 (deposit of unsolicited royalty checks could not establish implied ratification of pooling where lessor made contemporaneous objection and believed she was owed significant royalties with or without the pooling); *cf. Buchanan v. Sinclair Oil & Gas Co.*, 218 F.2d 436, 440 (5th Cir. 1955) (lessor estopped by acceptance of delay rentals without complaint or objection).

Further, it is undisputed that Point Energy did not know what, if anything, MRC ultimately owed or what Point Energy was entitled to receive. *See Frazier*, 472 S.W.2d at 753; *BPX*, 629 S.W.3d at 201; *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 292 (Tex. App.—Amarillo 1998, pet. denied) (post-termination acceptance of shut-in royalty could not establish quasi-estoppel in absence of evidence that recipient knew material facts). Point Energy clearly notified MRC that any royalty payments during the litigation were subject to a final determination of the

14

amount owed. Both sides agree an accounting remained necessary to determine whether any overpayment occurred, and the claim for an accounting was pending when all the royalty payments were made. Point Energy further represents in its brief, as stated in the Lessors' reservation-of-rights letters and their joint pleadings, that the amount MRC owes "will of course be offset by the money MRC paid the Lessors as royalties," the "same result if MRC had deposited the funds with the trial court." In this circumstance, it is not unconscionable to allow Point Energy to maintain both its request for an accounting and its Lease termination claims that were pending at the time the Lessors accepted the royalty payments.

Accordingly, we conclude that MRC has not shown a genuine issue of material fact exists on its quasi-estoppel defense, and thus, the trial court properly granted summary judgment in Point Energy's favor on this issue. We overrule this issue.

## IV.  PRODUCTION UNIT SIZE

Having resolved the termination question against MRC, we next interpret the Lease's retained-acreage clause. The clause provides that MRC is entitled to designate one Production Unit for each producing commercial well and requires it to do so by filing its designation with the county in which the well is located within 90 days of the well completion. The clause defines the size of a Production Unit for a producing oil well as either 176 acres (160 acres plus the 10% tolerance amount) or 352 acres (320 acres plus 10% tolerance) depending on whether the "wellbore extends horizontally in the producing formation" more than 5,000 feet. The parties disagree over the meaning of this phrase, with Point Energy urging that the maximum Production Unit size is 160 acres (without addressing the 10% tolerance) based on its method of measuring the length of the wellbore, while MRC argues that the Production Unit size is 352 acres based on its method of measurement. The parties further disagree on whether MRC's failure to timely designate the Production Units, as set forth in the Lease, limited it to claiming only the lesser acreage amount.

15

## A. Standard of review and contract construction principles

The general principles governing the construction of contracts also govern the construction of an oil-and-gas lease. *Endeavor Energy Resources, L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018). We review and construe mineral leases de novo. *Id.*

We begin with the "plain, ordinary, and generally accepted meaning" of the terms of the Lease within its four corners, unless terms are defined or used in a "technical or specialized way." *Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 339 (Tex. 2023). If portions of the text "appear contradictory or inconsistent," we "strive to harmonize all of the parts, construing the instrument to give effect to all of its provisions." *Luckel v. White*, 819 S.W.2d 459, 462 (Tex. 1991). The Texas Supreme Court has increasingly discounted canons of construction, "particularly in [its] decisions addressing mineral-interest conveyances." *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 744, 746 (Tex. 2020). Courts are encouraged to "resolve any conflicts by harmonizing the agreement's provisions, rather than by applying arbitrary or mechanical default rules." *Id.* at 744. We also "avoid strictly construing an instrument's language if it would lead to absurd results." *Kourosh Hemyari v. Stephens*, 355 S.W.3d 623, 626 (Tex. 2011).

Nevertheless, when the text is "inconclusive," we may consider surrounding facts and circumstances to "shed light on the objective meaning conveyed by the text." *Endeavor*, 615 S.W.3d at 152–53. For example, we may generally consult "contemporary dictionaries because they convey objective and generally available—not subjective or bespoke—guides to meaning." *Van Dyke v. Navigator Group*, 668 S.W.3d 353, 362 (Tex. 2023). We also consider contemporaneous cases and statutes. *Id.* Oil and gas experts "have a proper (if confined) role," *Dynegy Midstream Services, Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 170 (Tex. 2009), but expert opinions as to the meaning of common oil and gas terms are not necessary. *Nettye Engler*

16

*Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 691 (Tex. 2022); *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 486 (Tex. 2019).

Last, after we have applied all pertinent construction principles, if lease language remains susceptible "to two or more reasonable interpretations, then the agreement is ambiguous as a matter of law." *Endeavor*, 615 S.W.3d at 148. "In most instances, an ambiguous contract's meaning must be determined by a finder of fact, who may consider evidence of the parties' subjective intent." *Id.*

### B. MRC's failure to timely designate Production Units did not cause the Lease to terminate as to the disputed amount of the units

We start with the question of what effect, if any, MRC's admitted failure to timely designate Production Units had on its right to now claim entitlement to 352-acre units for the wells in question. As set forth above, the Lease required MRC, upon completion of each commercial well, to file a written designation of a corresponding Production Unit in the county where the well was located within 90 days after well completion (the designation-and-filing requirement). MRC admittedly did not record any designations until this lawsuit was filed, more than 90 days after each well was completed, at which time it designated two Production Units of 352 acres for its still-producing Totum #211 Well and the stacked Jackson Trust Wells. Point Energy contends MRC's failure to timely record a written designation of retained acreage resulted in capping the amount of retained acreage at the minimum size of 160 acres per well.[11]

Point Energy maintains the 90-day designation-and-filing requirement was a special limitation that caused the Lease to partially terminate as to the Production Unit sizes when it was not fulfilled. A special limitation in an oil-and-gas lease is a provision that a lease will

---

[11] As MRC observes, the logical outcome of Point Energy's position would ordinarily be that MRC forfeited *all* retained acreage by failing to make a timely designation. Point Energy provides no explanation for its assertion that MRC retained 160 acres despite missing the 90-day deadline. MRC speculates that Point Energy may have adopted this approach "to make its argument more palatable." In any event, we assess the parties' arguments as they are presented to us, and we will not address whether a full forfeiture should have occurred.

17

automatically terminate upon the happening of a certain event—that is, a "condition that results in termination." *Cromwell v. Anadarko E&P Onshore, LLC*, 716 S.W.3d 515, 524 (Tex. 2025). For example, a lease may provide that it will automatically terminate upon the "cessation of production in contravention of the lease's terms or failure of the operator to commence drilling or reworking operations within the time the lease required." *PPC Acquisition Co. LLC v. Delaware Basin Res., LLC*, 619 S.W.3d 338, 349 (Tex. App.—El Paso 2021, no pet.) (citing *Endeavor*, 554 S.W.3d at 606); *Rogers v. Ricane*, 772 S.W.2d 76, 79 (Tex. 1989)). A special limitation "does not operate to cut short the estate but simply fixes one of the natural limits of the estate beyond which the estate cannot endure, being similar in this respect to a general limitation, and, like a clause of general limitation, is in no proper sense a forfeiture provision." *Endeavor*, 554 S.W. 3d at 606 n.14.[12] But a court will not find a special limitation "unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." *Id*.

Point Energy relies primarily on the Texas Supreme Court's holding in *Endeavor* for the proposition that the 90-day designation-and-filing requirement in the Lease's retained-acreage clause contained clear language rendering it a special limitation. In *Endeavor*, however, the parties' leases expressly stated that the leases "shall automatically terminate" as to all acreage not assigned to a Production Unit. *Endeavor*, 554 S.W.3d at 606. There, the court recognized that the "plain, grammatical language" of the leases demonstrated that the parties intended the leases "to continue only as to acreage that had been assigned to a well as reflected in the certified plats [the appellant] filed with the [Railroad] Commission." *Id.* Here, however, the retained-acreage clause contained

---

[12] A special limitation is similar to, but distinct from, a condition subsequent in a lease, the breach of which will "cut short the natural limit of the leasehold interest. *Endeavor Energy Resources, L.P. v. Discovery Operating, Inc*., 554 S.W.3d 586, 606 n.14 (Tex. 2018). In other words, the breach of a condition subsequent results in a forfeiture of the lease. *Id*. (citing A.W. Walker, Jr., *The Nature of the Property Interests Created by an Oil and Gas Lease in Texas*, 8 Tex. L. Rev. 483, 486 (1930) ("A condition subsequent is a forfeiture provision; it renders the estate liable to be defeated by the happening of the event expressed in the condition prior to the normal termination of the estate.").

no such clear and unambiguous language indicating the Lease would terminate if the designation-and-filing requirement was not met.

Based on a plain reading of lease terms, we agree with MRC that the 90-day designation-and-filing requirement was only a covenant, rather than a special limitation that resulted in termination of the Lease. In contrast to a special limitation, a covenant in an oil-and-gas lease is "merely a promise made by the lessee to perform a certain action, and the lessee's failure to perform the action does not cause the lease to automatically terminate; instead, any such failure only subjects the lessee to a lawsuit for damages resulting from the breach of contract or to obtain specific performance of the covenant." *PPC Acquisition Co*, 619 S.W.3d at 349 (citing *Rogers*, 772 S.W.2d at 79; *Parten v. Cannon*, 829 S.W.2d 327, 330–31 (Tex. App.—Waco 1992, writ denied) (breach of covenant in oil-and-gas lease did not result in termination of the entire lease and instead only gave rise to a cause of action allowing the lessor to recover damages for breach of contract)).

Here, the designation-and-filing requirement made no reference to termination of the Lease; it simply stated MRC agreed to make a designation of Production Units within 90 days of well-completion. In interpreting a similar designation-and-filing provision in a retained-acreage clause in an oil-and-gas lease, our sister court held that the provision, which required "the lessee to file with the county clerk a written designation allocating portions of the land to producing wells at the end of the primary term," was a covenant rather than a special limitation. *Parten*, 829 S.W.2d at 330. In reaching this conclusion, the Waco Court of Appeals found it significant that there was nothing in the lease indicating it would automatically terminate upon breach of the provision. *Id*. at 331. Similarly, in *PPC*, we concluded a retained acreage clause stating that after the expiration of the primary term of the lease and the cessation of continuous drilling, the lessee was required

19

to "release all acreage not then dedicated to a proration unit designated by the appropriate regulatory body" was a covenant rather than a special limitation. *PPC Acquisition Co*, 619 S.W.3d at 347. In particular, we observed that the clause, which had no termination language, "merely contained a covenant made by the lessee to release acreage upon the triggering event, the breach of which did not automatically terminate the lease, either in whole or in part." *Id*. at 349.

Accordingly, as the Lease's retained-acreage clause contained no language indicating it would automatically terminate in whole or in part if MRC failed to timely designate Production Units, we conclude the 90-day designation-and-filing requirement is a covenant, and any breach of that provision cannot result in termination of the lease or otherwise limit the size of the Production Units. We will therefore proceed to determine whether MRC was entitled to designate 352 acres per producing well (to include 10% tolerance) as MRC claims, or whether it was only entitled to designate 160 acres per well (without addressing 10% tolerance) as Point Energy claims.

## C. Determining the proper method of measurement

MRC maintains on appeal, as it did in the trial court, that it retained 352 acres in two Production Units, to include the 10% tolerance amount set forth in the lease, for a total of 704 acres. Point Energy agrees that MRC is entitled to two Production Units, one for the Totum #211 Well and one for the Jackson Trust Wells, but that the units should be limited to 160 acres each, without addressing whether MRC is entitled to claim 10% tolerance for those units.[13] The parties'

---

[13] Although Point Energy alleged in its trial court pleadings that MRC waived its right to tolerance acreage by failing to timely designate its production units, Point Energy did not urge this particular argument on appeal. Instead, it generally argues that MRC "could not retain Production Units larger than 160 acres because it failed to timely claim them," but it does not explicitly address the question of whether MRC is entitled to claim 10% tolerance for those units. However, even assuming Point Energy did not forfeit this issue by failing to address it on appeal, any argument that MRC waived its right to claim 10% tolerance due to its failure to timely designate Production Units lacks merit because—as we have previously explained—the Lease's designation provision is a covenant, and any breach of that covenant cannot limit the size of the Production Units.

20

disagreement centers on the proper method for calculating the size of the Production Units as set forth in the Lease's retained-acreage clause.

Under the retained-acreage clause, each Production Unit must (1) contain the wellbore, (2) be "as nearly square or rectangular as reasonably practicable," and (3) "shall include all depths from the surface to 100 feet below the base of the deepest producing formation in a Commercial Well on the Production Unit as of the time this lease divides into Production Units." It further provides, "this lease shall then automatically terminate as to all depths below that level." The Lease explains the acreage cap per Production Unit in terms of 5,000 feet of horizontal wellbore extension:

> [A] Production Unit shall not exceed 160 acres plus 10% tolerance if less than 5000 feet of its wellbore extends horizontally in the producing formation, and shall not exceed 320 acres plus 10% tolerance if more than 5000 feet of its wellbore extends horizontally in the producing formation;

The parties agree that the facts regarding the length and position of each wellbore in the wells in question are undisputed and verified by public records. But the parties dispute how to measure the 5,000-foot threshold for the acreage cap.

MRC contends the horizontal measurement begins where the wellbore first enters the relevant producing formation, i.e., the penetration point, and ends at the terminus of the wellbore. Based on this method of measurement, MRC maintains the wellbore in the Totum #211 extends 5,096 feet horizontally in the producing formation from the penetration point to the terminus.

Using the same method of measurement, MRC maintains the wellbore in the Jackson Trust #121H Well extends 5,279 feet horizontally. Accordingly, MRC contends it is entitled to claim the maximum Production Unit of 352 acres for that well. And as set forth above, MRC does not claim separate acreage for the other Jackson Trust Wells, conceding that, although it filed separate written

21

designations of Production Units for the other three Jackson Trust Wells, they each fall within the boundaries of the 352-acre tract for the Jackson Trust #121H Well.[14]

Point Energy advocates for a different method of measurement, which rests on two factors. First, Point Energy urges the "horizontal" measurement should not begin at the first penetration point into the producing formation, and instead should begin at the first "take point" where oil is being produced up to the last "take point." Second, Point Energy contends the wellbore should only be measured at the point where it is "reasonably" horizontal, or, in its view, within 5–15 degrees of true horizontal (i.e., inclined at an angle 75–85 degrees from vertical). Based on this method of measurement, Point Energy maintains the wellbore of the Totum #211 well extends only 4,426 feet horizontally and the wellbore of the Jackson Trust #121H well extends only 4,846 feet horizontally in the respective formations. Point Energy therefore contends MRC is only entitled to claim 160 acres in Production Units per well configuration. Thus, as Point Energy seeks to frame the issue, "the dispute is whether to measure parts of the wellbores that are not horizontal and not producing." We consider both aspects of this issue in reverse order—that is, whether Production Units are based on the length of (1) the "producing" portion or (2) the "reasonably horizontal" portion of the wellbore.

### (1) The Lease does not limit the measurement of the wellbore to only producing segments

---

[14] MRC claims the same 352 acres for the Jackson Trust #021H, #101H, and #121H wells. It concedes the Jackson Trust #211[H] Well does not reach 5,000-feet. It is undisputed that MRC is entitled to retain only 176 acres for the related Production Unit based on that wellbore. We therefore do not consider the length of that wellbore and, following the parties' briefing, limit our analysis to the length of the wellbore for the Jackson Trust #121H Well and the size of the Production Unit determined by the length of that wellbore.

To support its position, Point Energy primarily relies on the Texas Supreme Court's decision in *Murphy Expl. & Prod. Co.-USA v. Adams*, 560 S.W.3d 105, 111 (Tex. 2018). But we find *Murphy* distinguishable. In *Murphy*, the Supreme Court determined whether a horizontal well located on leased property could be considered an "offset well," i.e., a well that is intended to protect against drainage from a well on adjacent property. *Id*. at 113. The Court noted that, unlike vertical wells, which "effectively drain[] a surrounding area" because of their "high natural porosity and permeability," *id*. at 110, "horizontal drilling in conjunction with hydraulic fracturing" allows developers to drill in "tight reservoirs" where hydrocarbons "are not susceptible to migration in the same fashion as found in formations traditionally targeted by vertical drilling" and therefore pose only a minimal drainage risk. *Id*. 111–112. It further recognized that for drainage purposes, "the only locations that matter in the horizontal-drilling context are the locations of the perforated and fractured portions of the horizontal wellbore." *Id.* at 112. And it declared that "[t]he vertical portion of a horizontal well and the nonperforated portions of the horizontal wellbore are essentially irrelevant for production purposes." *Id*. at 111. In other words, the Court recognized that a horizontal well "may be drilled in close proximity to [a] lease boundary, yet have absolutely no chance of preventing (or causing) drainage depending on the direction of the horizontal wellbore and the placement of the perforations." *Id*. at 112.

Relying on this last sentence in *Murphy*, i.e., that the nonproducing portions of a wellbore are irrelevant for drainage purposes, Point Energy contends we should similarly conclude that the nonproducing portions of the wellbores of the Totum #211H and Jackson Trust Wells are also irrelevant for determining whether the wellbores extend more than 5,000 feet horizontally into the producing formation. But when read in full context, *Murphy* simply observed that horizontal drilling poses less risk of drainage than vertical drilling, and even so, the only risk of drainage is

23

in the producing segments of the wellbore.[15] The holding in *Murphy* does not support Point Energy's contention that we should only count the "producing" segments of the wellbores.

Nor does the plain language of the Lease support Point Energy's argument. As MRC notes, the Lease only specified that the wellbore itself had to extend more than 5,000 feet horizontally "in the producing formation." It did not limit the portion of the wellbore's measurement to its "producing" segments. Although the Lease does not define the term "producing formation," the term has a well-established meaning in the oil and gas industry: an "underground rock formation from which oil, gas or water is produced." Schlumberger Ltd, *Energy Glossary*, https://glossary.slb.com/terms/p/producing_formation (last visited Nov. 25, 2025); *see also Amarillo Oil Co. v. Energy-Agri Products, Inc.*, 794 S.W.2d 20, 21, n. 3 (Tex. 1990) (defining a "formation" in the context of an oil-and-gas lease as a "succession of sedimentary beds that were deposited continuously and under the same general conditions . . . usually named for the town or area in which the [formation was] first recognized and described") (citing Williams & Meyers, Manual of Oil & Gas Terms § 373 (1987)); *see also Sun Expl. & Prod. Co. v. Jackson*, 783 S.W.2d 202, 204 (Tex. 1989) (referring to a producing formation as a geological "stratum" in which targeted hydrocarbons reside "from which production is being obtained").[16] The parties do not appear to dispute the point at which the wellbores entered the producing formations identified in MRC's well completion reports.

---

[15] Point Energy also relies on the Texas Supreme Court's holding in *Lightning Oil* to support its proposition that we should ignore the nonproductive portions of the wellbores in determining whether they extended more than 5,000 feet into the producing formation. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 51 (Tex. 2017). On this narrow point, we do not find *Lightning Oil* helpful to Point Energy's argument, as discussed further below.

[16] This interpretation also aligns with Railroad Commission terminology, which distinguishes between a "producing formation" and the narrower "producing interval." *See* 16 Tex. Admin. Code § 3.41 (field designations must identify "commission-assigned field names, names of the producing formations, and approximate average depth of the producing interval"). In this regulatory context, the phrase "extends horizontally in the producing formation" is best understood to measure the wellbore's length within the named producing formations and not the producing intervals as reported on MRC's well completion reports.

Moreover, the Lease makes no mention of any specific points in the producing formation, such as penetration points, terminus, end points, or take points that would support Point Energy's measurement method. None of the terms appear in the Lease; rather, they appear to originate from as-drilled plats prepared by MRC and submitted with its well completion reports in accordance with Railroad Commission regulations. But Point Energy concedes in its brief that because the parties chose their own standard for determining the size of the Production Units, "any regulatory filings [are] irrelevant" in determining how the horizontal length of the wellbore should be measured.

Point Energy nevertheless argues the parties must have intended to measure only the "producing" segments of the wellbores as there would have been no reason for the parties to agree to allow MRC to claim larger Production Units based solely on the existence of a longer wellbore. According to Point Energy, the parties' intent was not simply to award greater acreage for longer wellbores regardless of their productivity, but the intent was to reward MRC for longer wellbores that increased the wells' "productive capacity."

Given the plain text of the retained-acreage clause, we disagree with this argument and turn to our sister court's opinion in *Bell v. Chesapeake Energy*. There, the parties entered into a lease in which the lessee agreed to pay the lessor a "compensatory royalty" if it drilled an "adjacent well" on unleased property within a certain number of feet from the leased premises, as it would then be deemed to be draining from the leased premises. *Bell v. Chesapeake Energy Corp.*, No. 04-18-00129-CV, 2019 WL 1139584, *1 (Tex. App.—San Antonio Mar. 13, 2019, pet. denied) (mem. op.) The lease in *Bell* specified that in the context of horizontal drilling, an adjacent well was "one whose surface location or subsurface path 'from its point of entry into the productive horizon to its terminus'" was within a designated distance from the lease boundaries. *Id.* at *14.

25

The lessee argued that the parties intended to calculate compensatory royalty as a percentage of production attributable only to perforations (take points) along the wellbore within the designated distance rather than production from the entirety of the wellbore. *Id.* at *13. The court disagreed, citing the lease's definition of adjacent wells and explaining that compensatory royalty was based on production from adjacent wells and not from segments of the wellbore or "'mini-wells' defined by individual take points" in determining compensatory royalty. *Id.* at *14. Effectively, the court construed the compensatory royalty clause in the same way as we construe the retained-acreage clause here and rejected the take-point approach suggested by Point Energy. The court further noted that although the parties could easily have specified the take-point approach if that was their intent, they did not, and the court declined to rewrite their lease to insert a new provision. *Id*. at *13–14 (citing *Tenneco Inc. v Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("courts will not rewrite agreements to insert provisions parties could have included").

Here too, the parties could have easily provided lease language indicating they only wished to measure the "producing portion" of the wellbores in determining its length for purposes of the retained-acreage clause. But they did not. Instead, the Lease clearly indicates that the length of the wellbores were to be measured based on how far they extended horizontally into the producing formation; in other words, as MRC points out, the Lease describes "*where* the wellbore is rather than *what* the wellbore is doing." We will not rewrite the parties' Lease to add a requirement that the wellbore must be producing at a given point to count as part of the relevant measurement.

### (2) The wellbores extended horizontally at the penetration point of the producing formation and should be measured from there

The only remaining question is at what point we can say that the wellbore—whether producing or not—extended "horizontally" into the "producing formation." The Lease does not

26

provide a definition for the term "horizontally," and the parties disagree over how it should be interpreted.

Like other horizontal wells, the wellbores at issue "start vertically, then 'kick-off' horizontally." *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 43 (Tex. 2017). As Point Energy notes, because the steel drilling pipes cannot make "sharp turns," there is a curved section between the points where the wellbore is vertical and horizontal. As *Lightning Oil* observed, these well-types "can take several thousand feet to kick-out and transition the roughly 90 degrees from vertical to horizontal." *Id.* And Point Energy contends that because regulatory records for the wells demonstrate the wellbores entered each production formation "long *before* they actually extend horizontally," the question is at what point the wellbore curves sufficiently enough to be considered "horizonal."

Initially, Point Energy maintains the term "horizontal," as used in common parlance, means "[p]arallel to the plane of the horizon; at a right angle to the vertical," (citing *Horizontal*, NEW OXFORD AMERICAN DICTIONARY 838 (3d ed.) and *Horizontal*, DICTIONARY.COM (defining "horizontal" as "at right angles to the vertical; parallel to level ground")). But it concedes that the "strata far underground," such as in a producing formation, "are usually not *precisely* parallel to the surface."

Point Energy suggests in briefing that the term "horizontally" implies a maximum inclination of 75 degrees from vertical. In support, it again relies on *Lightning Oil*, 520 S.W.3d at 51. There, the Supreme Court discussed the need for off-lease drilling allowing operators to drill a horizontal well that starts vertically on an adjacent surface tract then curves under the neighbor's subsurface to travel to its destination in the operator's lease. *Id*. at 51. The Court observed that sometimes this may be the only practical method to fully exploit the leased minerals; otherwise,

the length of steel drill pipe required to turn "roughly 90 degrees from vertical to horizontal" could result in avoidable "blind spots." *Id.* By drilling from an adjacent surface location—through subsurface not covered by the lease—the operator can drill a well that is "nearly or completely horizontal when it enters the productive lease formation." *Id.* at 50–51.

Relying on this language in *Lightning Oil*, Point Energy urges us to construe the retained-acreage clause to require the wellbore to be at a roughly 90-degree angle before it can be considered "horizontal." According to Point Energy, "if the phrase 'horizontally in the producing formation' is to have any meaning at all, it cannot include *vertically* in the producing formation; it must mean something like 'roughly 90 degrees.'" Based on this premise, Point Energy maintains the horizontal measurements of the wellbores of both the Jackson Trust and the Totum #211 wells, if measured from less than an 85-degree angle, fall short of 5,000 feet.

We do not, however, interpret *Lightning Oil* to hold that a wellbore "extends horizontally" only when it is nearly at a 90-degree angle to vertical, or parallel to the surface. To the contrary, *Lightning Oil* only explained the long curvature required for the wellbore to become fully, or even roughly, "horizontal." And as MRC points out, the language of the Lease itself does not provide that the wellbore must be completely horizontal or at a 90-degree angle at the initial point of measurement. In fact, the Lease does not provide any numerical limits or parameters—in degrees or angles—for determining what portion of the wellbore may be considered to be "extending horizontally." And we decline to add a particular numerical limitation to the Lease where the parties did not do so. Moreover, imposing a requirement that the wellbores must be at a particular angle before they can be considered to be extending horizontally ignores the very nature of horizontal drilling, which is generally not expected to produce a perfectly horizontal wellbore at any point in its journey to its terminus. As MRC's drilling engineer explained, the wells here were

28

each drilled vertically until the kick-off point, at which point they followed a curved path that "extends both vertically and horizontally." Therefore, he explained, the part of the well that extends horizontally "would be kickoff point to toe, because part of the curve extends horizontally as well." This explanation is consistent with the way the Supreme Court has described how a wellbore extends "horizontally," *see Lightning*, 520 S.W.3d at 43, 50–51, and it sheds light on the plain meaning of the Lease language at issue, *see Endeavor*, 615 S.W.3d at 152–53.

To use an analogy suggested by MRC, the distance a car travels "east" on Interstate 10 most commonly means the distance the car travels along the highway as measured by mile markers. It would not normally be understood to mean the distance as the crow flies due east from the starting point and ending at a point at the same latitude somewhere off the highway. Nor would one subtract the parts of Interstate 10 that do not fall within a "reasonable" range of east, such as where the highway veers north and south around San Antonio. Like highways, horizontal wellbores must navigate topography and subsurface geology, and this reality is reflected in the way the term "horizontally" is used in the context of horizontal drilling.

Thus, for purposes of interpreting the Lease, we conclude that a wellbore "extends horizontally in the producing formation" after it has deviated or "kicked off" from its vertical orientation and has entered the producing formation, regardless of its angle, and has begun to curve horizontally in its path to the terminus.[17] And in turn, we therefore conclude that the size of Production Units is determined by the "measured depth" of the wellbore from the point after it has

---

[17] MRC at times refers to "horizontally" as meaning "in the horizontal direction" rather than at a horizontal "angle." We note, however, that the term "direction" has a special meaning in the context of horizontal drilling. *Hastings Oil Co. v. Tex. Co.*, 234 S.W.2d 389, 392 (1950) (distinguishing "direction" from the angle or "degrees" of deviation); *see also* 16 Tex. Admin. Code § 3.11(d)(1)(A) (requiring directional surveys in the case of "directional deviation" or "intentional deviation of a well from vertical in a predetermined compass direction"); 16 Tex. Admin. Code § 3.86 (requiring directional surveys for all horizontal wells); *see also State v. Harrington*, 407 S.W.2d 467, 471–72 (Tex. 1966) (explaining directional survey rule). But we do not interpret MRC's method of measurement to refer to "direction" in that sense.

kicked off from its vertical orientation and has entered the producing formation until it reaches its terminus.

No one disputes that, following this method of measurement, the Totum #211H Well and the Jackson Trust #121H Well both extend horizontally more than 5,000 feet in the producing formation, entitling MRC to retain "320 acres (plus 10% tolerance)" under the retained-acreage clause. Accordingly, we conclude that MRC is entitled to two 352-acre Production Units, totaling 704 acres.[18]

Because MRC was entitled to designate the maximum 352 acres as the Production Unit for the Totum #211H and for the Jackson Trust wells, which includes the 10% tolerance amount, for a total of 704 acres, we hold that the trial court did not err in holding that the Lease was unambiguous and in rejecting Point Energy's argument that MRC's retained acreage was limited to two 160-acre Production Units, but it did err in failing to render judgment that MRC holds 352-acre Production Units as specifically described in its written designations.

## V. CONCLUSION

We affirm the trial court's partial summary judgment on MRC's quasi-estoppel defense. We affirm in part and reverse in part the trial court's ruling on the size of Production Units. We render judgment that MRC holds title under the Lease to two Production Units covering 352 acres in Section 18 and 352 acres in Section 12, as described in its recorded designation of Production Units. And we remand for an accounting and further proceedings relating to Appellees/Cross-Appellants' breach-of-contract counterclaim consistent with this opinion.

---

[18] Although Point Energy alleges in its live pleading that MRC waived its right to tolerance acreage by failing to properly request it, Point Energy did not urge this argument on appeal. It argues that MRC "could not retain Production Units larger than 160 acres because it failed to timely claim them," but does not explicitly refer to tolerance. Even assuming Point Energy did not forfeit tolerance acreage on appeal, its waiver argument fails for precisely the same reason as its argument that MRC waived the rest of its retained acreage. As we previously explained, the Lease's designation provision is a covenant, and any breach of that provision cannot limit the size of Production Units.

GINA M. PALAFOX, Justice

December 9, 2025

Before Palafox, J., Soto, J., and Rodriguez, C.J. (Ret.)
Rodriguez, C.J. (Ret.), (sitting by assignment)